## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BOOTH FAMILY TRUST, derivatively on behalf of Nominal Defendant XM Satellite Radio Holdings, Inc.**<br>**34 Nelson Place**<br>**Tenafly, New Jersey 07670** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) | **Case No.** |
| **GARY M. PARSONS, HUGH PANERO, NATHANIEL A. DAVIS, THOMAS J. DONOHUE, EDDY W. HARTENSTEIN, GEORGE W. HAYWOOD, CHESTER A. HUBER, JR., JOHN MENDEL, JARL MOHN JACK SHAW,**<br>**1500 Eckington Place, N.E.**<br>**Washington, D.C. 20002** | ) ) ) ) ) ) ) ) ) | |
| **Defendants,** | ) ) | |
| **and** | ) ) | |
| **XM SATELLITE RADIO HOLDINGS, INC.,**<br>**1500 Eckington Place, N.E.**<br>**Washington, D.C. 20002** | ) ) ) ) | **JURY TRIAL DEMANDED** |
| **Nominal Defendant.** | ) | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by its attorneys, submits this Verified Shareholder Derivative Complaint.

### NATURE OF THE ACTION

1.    This is  a shareholder derivative action brought by Plaintiff for the benefit of

Nominal Defendant XM Satellite Radio Holdings, Inc. ("XM" or the "Company") against

Defendants Gary M. Parsons ("Parsons"), Hugh Panero ("Panero"), Nathaniel A. Davis, ("Davis"), Thomas J. Donohue ("Donohue"), Eddy W. Hartenstein ("Hartenstein"), George W. Haywood ("Haywood"), Chester A. Huber, Jr. ("Huber") John Mendel ("Mendel"), Jarl Mohn ("Mohn"), and Jack Shaw for violations of their fiduciary duties owed to XM from July 28, 2005 through the present (the "Relevant Period").[1]

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

3.      This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

4.      Venue is proper in this district because a substantial portion of transactions and wrongs complained of herein occurred in this district.  Further, Defendants either reside or participated in board of director meetings or maintain executive offices in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business in this district.  Further, XM maintains its principal place of business in this district.

## PARTIES

5.      Plaintiff, Booth Family Trust, as set forth in the Verification, is and was during the Relevant Period, a shareholder of XM.  Plaintiff is a citizen of the State of New Jersey.

---

[1]  Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between July 28, 2005 and February 15, 2006, the Relevant Period continues through this day instead of ceasing on February 14, 2006, the day before the public became aware of the wrongdoings at the Company.

6.    Nominal Defendant XM provides a satellite radio service in America broadcasting live daily shows from several venues including Washington, D.C., with a lineup that includes more than 150 digital channels of choice from coast to coast.  XM also bills itself as the leader in satellite-delivered entertainment and data services from the automobile market.  XM has yet to report a profit.  Thus, XM's value and, thus, the value of its stock is based principally on the number of subscribers it reports and the costs of acquiring those subscribers.  In XM's SEC Forms 10-Q, filed during the Relevant Period, Defendants stated that "the key metrics we use to monitor our business growth and operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Costs Per Gross Addition ("CPGA")."  Accordingly, when XM releases it financial results, it reports the specific dollar amount of SAC and CPGA and the market looks to these costs, as well as the number of ending subscribers as the key factors assessing the value of XM and its stock price. XM is incorporated in the State of Delaware and its principal executive offices are located at 1500 Eckington Place NE, Washington, DC.

7.    Throughout the Relevant Period, the Defendants disseminated a series of false and misleading statements that misrepresented that XM was able to reduce the costs of its new subscribers as it reached its goal of 6 million subscribers by year end of 2005.  In reality and as known to or recklessly disregarded by Defendants, XM would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005, in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to Defendants since before the beginning of the Relevant Period.  Despite Defendants' knowledge that XM would be making those huge expenditures in the fourth quarter of 2005, Defendants failed to disclose that XM's cost of subscriber acquisition would rise to extraordinary levels, leading to

huge increases in XM's net losses, which was in complete reversal of the trends of declining subscriber acquisition costs and net losses Defendants were reporting and touting throughout the Relevant Period.

8.     The Company's Board of Directors currently consists of ten (10) members. Collectively, the Board owns approximately 10.5% of the Company's shares of common stock.

9.     Defendant Gary M. Parsons ("Parsons") is a citizen of the State of California. Parsons, at all relevant times, served on the Company's Finance Committee and is the Chairman of the Board of Directors.  Parsons is also considered an employee of XM Satellite Radio.

10.     Defendant Hugh Panero ("Panero") is a citizen of the District of Columbia. Panero, at all relevant times, served as the Company's President and Chief Executive Officer. Panero also served on the Company's Finance Committee and is a member of the Company's Board of Directors. Panero is considered to be an employee of XM Satellite Radio.

11.     Defendant Nathaniel A. Davis ("Davis") is a citizen of the District of Columbia. Davis, at all relevant times, served on the Company's Audit Committee and Nominating Committee and is a member of the Company's Board of Directors.

12.     Defendant Thomas J. Donohue ("Donohue") is a citizen of the State of Virginia. Donohue, at all relevant times, served on the Company's Compensation and Nominating Committee and is a member of the Company's Board of Directors.

13.     Defendant Eddy W. Hartenstein ("Hartenstein") is a citizen of the State of Connecticut.  Hartenstein, at all relevant times, served on the Company's Audit Committee and is a member of the Company's Board of Directors.

14.    Defendant George W. Haywood ("Haywood") is a citizen of the State of New York.  Haywood, at all relevant times, served on the Company's finance committee and is a member of the Company's Board of Directors.

15.    Defendant Chester A. Huber ("Huber") is a citizen of the State of Michigan. Huber, at all relevant times, is a member of the Company's Board of Directors.  Huber is also an employee of General Motors.

16.    Defendant John Mendel ("Mendel") is a citizen of the State of California. Mendel, at all relevant times, is a member of the Company's Board of Directors.  Mendel is also considered an employee of American Honda.

17.    Defendant Jarl Mohn ("Mohn") is a citizen of the State of Ohio.  Mohn, at all relevant times, served on the Company's Compensation and Finance Committee and is a member of the Company's Board of Directors.

18.    Defendant Jack Shaw ("Shaw") is a citizen of the State of Indiana.  Shaw, at all relevant times, served on the Company's Audit, Compensation, and Nominating Committee and is a member of the Company's Board of Directors.

19.    Defendants Parson, Panero, Davis, Donohue, Hartenstein, Haywood, Huber, Mendel, Mohn, and Shaw are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of XM's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to

material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

20.    The Individual Defendants, as senior officers and/or directors of XM, were controlling persons of the Company. Each exercised their power and influence to cause XM to engage in the fraudulent practices complained of herein.

21.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business by disseminating materially false and misleading statements and/or concealing material adverse facts.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

23.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

24.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies and practices and controls of the Company.  By virtue of such duties the Individual Defendants were required to, *inter alia*:

   a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirement, and all contractual obligations, including acting only within the scope of its legal authority;

   c.    exercise good faith in taking action to correct any misconduct and prevent its recurrence when placed on notice of improper or imprudent conduct by the Company and/or its employees.

25.    The Individual Defendants, particularly the Officers and members of the Board of Directors' Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Relevant Period

26.    During the Relevant Time Period, Defendants publicly issued false and misleading statements and failed to disclose material facts necessary to make Defendants' statements not false and misleading.

27.    On July 28, 2005, XM issued a press release announcing second quarter 2005 results and stating that, "with XM's first half performance and even stronger outlook for the second half of the year, XM is increasing 2005 subscriber guidance from 5.5 million to 6 million ending subscribers."   In the release, the Company reported that second quarter revenues had increased 136% to $125 million, stating that "the significant revenue growth was driven by record second quarter net subscriber additions of 647,226" and that the quarter ended with 4,417,490 subscribers.   XM reported that its net loss had declined to ($146.6) million, as compared to a net loss of ($166.1) million in the second quarter of 2004.   "Second quarter 2005 costs per gross addition (CPGA) was $98, an improvement of $3, or 3 percent, form the $104 CPGA reported in the second quarter of 2004."

28.    Shortly thereafter on July 29, 2005, Bernstein Research Call analysts, Craig Moffett and Amelia Wong, issued a report entitled XMSR:  Few Surprises But Strong Second Quarter Affirms Positive Long Term Trends.  In this report, the analysts were pleased that XM's second quarter results provided "little in the way of surprises."  Lack of surprises was good news in their mind and "longer term profitability trend appeared to be playing out nicely."  The report noted that "the operating cost story was a positive, with variable margins growing, and Subscriber Acquisition Costs (SAC) and Cost Per Gross Addition (CPGA) continuing to decline nicely despite a Buy One Get One free promotion during the quarter."  In conclusion they stated, "[W]e find that XM is continuing to reduce its net loss as well as still accelerating subscriber net ads very encouraging.  This indicates that costs are continuing to fall (especially SAC and CPGA) even while XM sustains a very fast rate of growth."  Thus, in their chart setting forth Bernstein's expectations for the third and fourth quarters of 2005 for SAC and CPGA, these

analysts expected SAC $48 for Q3 2005 and $47 for Q4 2005 and for CPGA, $78 for Q3 2005

and $91 Q4 2005.

29.    On August 5, 2005, Defendants filed XM's SEC Form 10-Q for the second

quarter of 2005.  Within the Company's 10-Q Form, Defendants stated the following:

> XM was continuing to grow our gross margin (calculated as revenues less variable costs which include revenue share & royalties, customer care & billing operations, cost of merchandise & ad sales) during the three months and six months ended June 30, 2005 while reducing our costs to acquire each new subscriber
>
> ***
>
> We will continue to incur operating losses until we substantially increase the number of our subscribers.  We are focusing on increasing subscribers and scaling our business while managing growth and containing costs.
>
> ***
>
> We expect SAC to decline in 2005 as compared to 2004
>
> ***
>
> We expect CPGA to decline in 2005 as compared to 2004.

30.    On September 27, 2005, the Company issued a press release entitled, "XM

Satellite Radio Tops Five Million Subscribers."  The press release stated in relevant part:

> With more than five million subscribers today, XM continues to expand its position as the leader in the satellite radio industry.  We are on tract to have more than six million subscribers by the end of the year.  Consumers are choosing XM because we offer the most choices, including the most commercial-free music and live sporting events, and the most advanced technology.  With the winning combination of outstanding new channels and breakthrough products in advance of the holiday season, XM is poised for record growth during the fourth quarter.

31.    On October 27, 2005, one month into the fourth quarter of 2005, XM issued a

press release.  The press release stated in relevant part:

**XM SATELLITE RADIO HOLDINGS INC. ANNOUNCES THIRD QUARTER 2005
RESULTS AND REAFFIRMS 6 MILLION SUBSCRIBER GUIDANCE**

**Revenues up 134% to $153 million in third quarter, compared to
prior year period; Subscribers double to 5,034,642 from prior year;**

**Expands lead with 617,152 net additions GM and Honda to produce
more than 2 million 2006 XM-equipped vehicles**

*Washington D.C., October 27, 2005* – XM Satellite Radio Holdings Inc.
(NASDAQ: XMSR) today reported financial and operating results for the
third quarter ended September 30, 2005. XM ended the quarter with
5,034,642 subscribers, doubling the 2,516,023 subscribers reported last
year for the third quarter. The growth was driven by third quarter net
subscriber additions of 617,152, a 48 percent increase over the 415,671 net
subscribers added in the third quarter 2004. Given its strong performance
in the first three quarters, XM reaffirms its guidance of exceeding
6 million subscribers by the end of 2005.

XM's net loss for the third quarter 2005 was ($131.9) million, as
compared to ($118.0) million in the third quarter 2004. XM reported an
EBITDA loss of ($73.8) million for the third quarter 2005 compared to a
third quarter 2004 loss of ($62.9) million.

**Record Revenue from Cost-Effective Subscriber Growth**

For the quarter, XM reported revenue of $153 million, an increase of 134
percent over the $65 million reported in the third quarter 2004. XM's third
quarter subscriber growth was driven by strong automotive and retail
distribution performance with a range of full-featured products. Subscriber
Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease
from the $57 in the third quarter 2004. Cost Per Gross Addition (CPGA)
in the third quarters of both 2005 and 2004 was $89. XM products are well
stocked for the holiday season and XM expects to accelerate its subscriber
and revenue growth through the fourth quarter.

32.    After the third quarter earnings release, XM Radio held its conference call during

which Defendant Panero was present and spoke.  Panero stated that the third quarter 2005 was a

quarter "that exemplified what I've characterized as the smart subscriber growth the company

has demonstrated quarter after quarter and year after year since we started service in November

2001."   He emphasized that "the third quarter again demonstrated XM's ability to deliver

dramatically increasing subscriber and revenue growth with the lowest subscriber acquisition

costs, or SAC, in the industry."   Further, he emphasized that "the secret to XM's smart

subscriber growth rather than growth at any costs is the ability to control marketing and product

expenses while rapidly growing subscribers. This quarter XM kept its fully loaded per unit costs capturing a new subscriber, or CPGA, constant at $89 – the same CPGA that we reported in the third quarter last year. These results provide us with the flexibility to aggressively advertise and market our service in the fourth quarter. In fact, that is what we are doing implementing a comprehensive media campaign comprised of advertisements, rebates and other promotional techniques to fully exploit the holiday selling season again this year."

33.    Following the third quarter earnings release and earnings conference call, Bernstein Research Call Analysts Craig Moffett and Amelia Wong issued a report dated October 20, 2005, in which they noted that XM reported solid 3Q results. In discussing costs, the Bernstein Research Call noted "subscriber acquisition costs (SAC) and costs per gross additions (CPGA) were both slightly higher than we expected. Part of the difference appeared to be higher than expected negative equipment margins associated with the costs of their 'buy one get one free promotion' that ran during 2Q and their $49.99 discount offer on the Rodie2Radio during 3Q. More radios being manufactured during the quarter to stock up retail channels in advance of the Christmas season could also have played a part; the Company commented that SM products were 'well stocked for the holiday season'." The report continued, "[M]anagement guided to higher SAC and CPGA in 4Q. XM continues to offer the Rodie2 at the $49.99 discounted price as its entry-level equipment offer, which can be expected to be popular with consumers. In addition, XM management stated on the earnings call that there will be more rebate offers and promotions to come for the holiday season. These strategies will keep the pressure on equipment margins and SAC in 4Q." These "aggressive marketing and advertising campaign planned for the holidays will mean higher advertising and marketing expenses, and therefore CPGA." As a result, Bernstein changed its estimates for fourth quarter for SAC to $61 and for CPGA to $110.

34.    Joe Euteneuer, Executive Vice President and Chief Financial of XM when discussing specific financial and operational metrics during the Q3 conference call stated:

> XM's SAC during the third quarter was a modest $53 per gross addition, a decline of $4 or 7%, from the $57 per gross addition in the third quarter of 2004.    CPGA for the third quarter 2005 was $89 per gross addition, unchanged from the third quarter 2004 and down from $98 in the second quarter 2005.  Similar to past trends, we expect fourth quarter SAC and CPGA to increase due to media and promotional activities during the upcoming holiday selling season.

35.    The Company issued a press release dated November 1, 2005, one third of the way through the fourth quarter.  XM touted the fact that it had increased its retail market share to 59% in the third quarter, from 56% in the second quarter.  In the press release, Defendant Panero stated, "XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor."

36.    On November 7, 2005, Defendants filed XM's SEC Form 10-Q for the third quarter of 2005.  In relevant part, Defendants stated the following:

> XM was continuing to grow our subscription margin (calculated as Subscription revenue less variable costs, which include Revenue share & royalties, and Customer care & billing operations) during the three months and nine months ended September 30, 2005 while reducing our Subscription acquisition costs)
>
> ****
>
> The timing of promotions and new contracts may cause SAC to fluctuate from period to period.
>
> ****
>
> The timing of promotions and new contracts may cause SAC to fluctuate from period to period.

37.    Defendants did not disclose that one of its most senior and knowledgeable directors, Pierce J. Roberts, Jr., who had been Bear Stearns' lead telecom banker, had become increasingly strident within the Company, at both the Board and senior managerial levels, about

the fact that the current direction was not in the best interests of XM.  Roberts was emphatic that XM needed to reign in its skyrocketing marketing, programming and promotional expenditures.

38.    During the Relevant Period and while in possession of material undisclosed information, Defendants Panero and Haywood's stock sales were extremely suspicious as to both the timing and amount sold in comparison to Defendants' historical XM trading activity. Specifically, during the Relevant Period, Haywood sold approximately half of his holdings.  The insider stock sales that occurred within the Relevant Period are set forth below:

| Defendant | Date | Shares Sold | Proceeds |
|-----------|------|-------------|----------|
| Panero | 12/06/05 | 413,334 | $11,846,000 |
| Haywood | 11/10/05 | 1,254,000 | $35,363,000 |
| Haywood | 11/09/05 | 391,774 | $11,193,000 |
| Haywood | 11/08/05 | 425,226 | $12, 387,000 |

39.    On February 16, 2006, Defendants issued a press release announcing XM's results for the fourth quarter 2005 and year 2005 results. Within this press release, Defendants disclosed the truth about the skyrocketing level of XM's subscriber acquisition costs in the fourth quarter of 2005.  The press release stated in relevant part:

**XM SATELLITE RADIO HOLDINGS INC. ANNOUNCES FOURTH QUARTER AND FULL YEAR 2005 RESULTS; XM TO EXCEED NINE MILLION SUBSCRIBERS AND REACH CASH FLOW BREAK-EVEN BY YEAR-END 2006**

*XM Adds Over 2.7 Million Net Subscribers in 2005; 2005 Subscription Revenue More than Doubles to $503 Million*

*Washington D.C., February 16, 2006* – XM Satellite Radio Holdings Inc. (Nasdaq: XMSR) today reported financial and operating results for the fourth quarter and full year ended December 31, 2005. XM reported

sharply higher 2005 revenue, and the Company said it expected to report positive cash flow from operations in the fourth quarter of 2006.

"2005 was a significant growth year for XM in which we added more than 2.7 million net subscribers," said Hugh Panero, President and CEO of XM Satellite Radio. "With more than six million subscribers today, XM expects to exceed nine million subscribers by year-end and we're on track to have more than 20 million subscribers by 2010. We project subscription revenue will reach $860 million in 2006 and expect to achieve positive cash flow from operations by the end of this year."

Panero continued, "Last week, we reinforced XM's position as the premium content leader across all of radio with our announcement of the "Oprah & Friends" channel that will complement our music, talk and sports programming starting in September."

XM ended 2005 with 5,932,957 subscribers, an increase of 84 percent over 2004. Despite an intensely competitive marketplace in the fourth quarter, XM achieved net subscriber additions of 898,315. Later than expected activations from strong holiday sales brought the total to more than six million during the first week of January.

"XM achieved significant growth, added quality content and signed up important new automotive distribution partners in 2005," Panero said. "At the start of 2005, XM had 3.2 million subscribers and led the satellite radio competition by 2.1 million subscribers. Over the course of the year, XM increased that lead to 2.6 million subscribers."

**Fourth Quarter and Full-Year Financial Results**

For the fourth quarter of 2005, XM reported quarterly total revenue of $177 million, an increase of 113 percent over the $83.1 million total revenue reported in fourth quarter of 2004. XM's full year 2005 total revenue was $558.3 million, an increase of 128 percent over the $244.4 million total revenue recorded in 2004. These quarterly and annual increases in revenue were driven by our significant subscriber growth and increases in average revenue per subscriber in connection with our price increase implemented in the second quarter of 2005.

For the fourth quarter, subscriber acquisition cost (SAC), a component of cost per gross addition (CPGA) was $89 compared to $64 in the same period last year. CPGA in the fourth quarter was $141 compared to $104 in the same period last year. These increases were primarily due to higher marketing expenses to meet a one-time competitive event in the fourth quarter. For full year 2005, SAC was $64, a slight increase from $62 in

2004, and CPGA was $109, compared to $100 in 2004. In the first quarter of 2006, XM expects a more normalized market environment and projects that SAC and CPGA will decrease in 2006.

XM reported an EBITDA loss of ($199.4) million for the fourth quarter of 2005, including $25.3 million in de-leveraging charges, compared to an EBITDA loss of ($139.7) million for the fourth quarter of 2004, which included $41.6 million in de-leveraging charges. The full year EBITDA loss was ($434.3) million, including $27.6 million in de-leveraging charges, compared to a 2004 EBITDA loss of ($388.4) million which included $76.6 million of de-leveraging charges. The increased EBITDA loss primarily resulted from our increase in subscribers as well as the higher fourth quarter marketing expenses.

XM's net loss for the fourth quarter of 2005 was ($268.3) million as compared to a net loss of ($188.2) million in the fourth quarter of 2004. For the full year 2005, XM's net loss was ($666.7) million, compared to a net loss of ($642.4) million in 2004.

In 2005, we continued to strengthen XM's balance sheet by selected de-leveraging activities. Specifically, XM entered into agreements to exchange debt with carrying value of $80 million ($94 million accreted face value at maturity) for $41 million cash and 18.3 million common shares. This activity related to the retirement of 100 percent or $23 million face value of our 14% Senior Secured Notes due 2010, $15 million of our 12% Senior Secured Notes due 2010 and $56 million of our 10% Senior Secured Convertible Discount Notes due 2009. From these activities, we recognized de-leveraging charges of approximately $28 million while eliminating $45 million of future interest payments. In January 2006, XM exchanged $52 million aggregate of the 10% Senior Secured Convertible Discount Notes due 2009 for 17.1 million shares. The Company estimated that this transaction would release it from $21 million of interest payments over the next four years. XM will recognize approximately $18 million of de-leveraging charges in connection with this transaction in the first quarter of 2006.

XM ended the year with $711 million in cash and cash equivalents with additional capacity provided by our undrawn $135 million GM Facilities. XM will opportunistically continue to improve and reshape the balance sheet in 2006.

40.    The market reacted negatively to Defendants' belated disclosure.  On February 15, 2006, XM's common stock price closed at $25.25.  With the disclosure on February 16,

2006, XM's common stock, on abnormally heavy trading volume fell 13% to close at $21.96 on February 17, 2006.

41.     On February 16, 2006 XM filed an SEC Form 8-K disclosing that Director Pierce J. Roberts, Jr., had submitted a letter of resignation.  In the February 13, 2006 resignation letter, Roberts stated, "I have been troubled about the direction of the company and do not believe that it is in the best interest of the company's shareholders.  For some time I have made my analyses and observations known in an increasingly vociferous manner to the Board and a number of senior managers of Company.  I am not having any useful effect and I care too much and believe in my own view too much to just 'go along'.  Given current course and speed there is, in my view, a significant chance of a crisis on the horizon.  Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes."

42.     On April 27, 2006, the Company provided further details regarding its financial position.  Within the Company's Form 8-K filed with the SEC, the Company stated:

> On April 25, 2006, we received a letter from the Federal Communications Commission stating that its Office of Engineering and Technology Laboratory has tested the Delphi XM SKYFi2 radio and has determined that its transmitter is not in compliance with the applicable emission limits. The letter seeks information from us regarding the testing, emissions and other matters relating to this radio. We are conducting an internal review, and anticipate responding to the letter shortly and cooperating fully.

> Also on April 25, 2006, we received a letter from the Federal Trade Commission stating that they are conducting an inquiry into whether our activities are in compliance with various acts, including the FTC Act, the Telemarketing Sales Rule, the Truth in Lending Act and the CAN-SPAM Act. This letter requests information about a variety of our marketing activities, including free trial periods, rebates, telemarketing activities, billing and customer complaints. We are conducting an internal review of these matters, and anticipate responding to the letter shortly and cooperating fully with this investigation.

> XM believes that it is too early in the process to determine the significance, if any, of these matters to our business, consolidated results of operations or financial position.

43.    As now revealed, the Company's earnings press releases, as well as its SEC filings portraying strong financial results, were materially false and misleading. As a result of these materially false and misleading statements and failures to disclose material facts, XM's common stock traded at artificially inflated prices during the Relevant Period.   Defendants materially misled the investing public, thereby inflating the price of XM common stock, by publicly issuing false and misleading statements and failed to disclose material facts necessary to make Defendants' statements, not false and misleading.   Said statements and omission were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations as detailed herein.

## DEMAND WOULD BE FUTILE

44.    All of these directors face a substantial likelihood of liability in this action because they knew their public statements in press releases and SEC filings were materially false and misleading as alleged above; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.  The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure to liability, under the *Caremark* doctrine, for the total abrogation of their duty of oversight.   These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation.

45. Plaintiff brings this action derivatively in the right and for the benefit of XM to redress injuries suffered by XM as a result of the breaches of fiduciary duty by the Individual Defendants.

46. Plaintiff will adequately and fairly represent the interests of XM and its shareholders in enforcing and prosecuting its rights.

47. Plaintiff is owner of XM common stock and was an owner of XM common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

48. Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile. At the time these derivative actions were commenced, the board of directors consisted of ten members: Gary Parsons, George Haywood (members of the Company's Finance Committee), Hugh Panero (the Company's President, Chief Executive Officer and member of the Board of Directors), Nathaniel A. Davis (member of the Company's Audit and Nominating Committee), Thomas J. Donohue (member of the Company's Compensation and Nominating Committee), Eddy W. Hartenstein (member of the Company's Audit Committee), Chester A. Huber, Jr. John Mendel (members of the Board of Directors), Jarl Mohn (member of the Company's Compensation and Finance Committee), Jack Shaw (member of the Company's Audit, Compensation, and Finance Committee). As detailed below, each of the directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

**Additional Likelihood of Substantial Liability of the Audit, Finance and Compensation Committee Defendants**

49.    Derivative Defendants Davis, Hartenstein, and Shaw also had enhanced responsibilities as members of the Company's Audit Committee.  That Committee was charged with direct responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.

50.    Given the size, scope, and blatancy of the financial misrepresentation described above, the Audit Committee members either knew of the financial manipulations or turned a blind eye to them.  Such conduct is also not protected by the business judgment rule and exposes these Individual Defendants to a substantial threat of liability in this action.

51.    In addition, Defendants Parson, Panero, Donohue, Haywood, Mohn and Shaw are further exposed to liability because of their membership on the Compensation and Finance Committee.  In those positions, they approved compensation and finance plans for senior executives and directors, pursuant to which millions of dollars were paid out by the Company based on financial results that have now turned out to be grossly inflated.

**Directors Parsons, Panero, Davis, Donohue, Hartenstein, Haywood, Mohn and Shaw Lack Independence**

52.    Defendant Director Panero as the Company's current President and Chief Executive Officer, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

53.    Directors Davis, Hartenstein, and Shaw are members of the Board's Audit Committee, and so, as described above, lack the sufficient independence with which to render a

disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

54.    Further Defendants Parson, Panero, Donohue, Haywood, Mohn and Shaw are members of the Board's Compensation Committee. In those positions, they approved stock option plans for senior executives and directors, pursuant to which millions of dollars were paid out by the Company based on grossly inflated financial results.

55.    Plaintiff has not made any demand on the shareholders of XM to institute this action since demand would be a futile and useless act for the following reasons:

      a.    XM is a publicly held company with approximately 259 million shares outstanding, and thousands of shareholders;

      b    Making demand on such a number of shareholders would be impossible for Plaintiff, who has on way of finding out the names, addresses or phone numbers of all the shareholders; and

      c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

56.    XM has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

      a.    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

      b.    Costs related to the current FTC investigation.

57.    Moreover, Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile and useless act for the following additional reasons:

      a.    Defendant Parsons and Panero are not considered independent directors of XM. Defendant Parson and Panero are beholden to XM because of their

employee status with XM.  Because of this, it is reasonable to conclude that they would not authorize suit against each other.  Therefore, demand upon Defendant Directors Parsons and Panero is futile.

b.      Defendant Huber is not considered an independent director of XM. Defendant Huber is a current employee of General Motors.  XM has a long-term distribution agreement with OnStar, a subsidiary of General Motors.  Therefore, demand upon Defendant Huber is futile.

c.      Defendant Mendel is not considered an independent director of XM. Mendel is an employee of American Honda Motor Co., Inc. ("Honda"). Honda owns approximately 11.4% of the Company's Class A Shares and holds approximately 63% of the Company's outstanding Series C convertible preferred stock.  Additionally, XM has a current distribution agreement with Honda.  Therefore, demand upon Defendant Mendel is futile.

d.      Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

e.      The Director Defendants of XM, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise accounting practices.  Each of the Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

f.      In order to bring this suit, a majority of the Directors of XM would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

g.      The acts complained of constitute violations of the fiduciary duties owed by XM's officers and directors and these acts are incapable of ratification.

h.      XM has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for XM any part of the damages XM suffered and will suffer thereby.

i.  The actions of the directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

j.  Any suit by the directors of XM to remedy these wrongs would likely expose the Director Defendants and XM to further violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

58.  Making demand on all shareholders would also force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

## FIRST CAUSE OF ACTION

### Against Individual Defendants for Breach of Fiduciary Duty

59.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

60.  The Individual Defendants owed and owe XM fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe XM the highest obligation of good faith, fair dealing, loyalty and due care.

61.  The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

62.  The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

63.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, XM has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

64.     Plaintiff, on behalf of XM, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Abuse of Control

65.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

66.     The Individuals Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence XM, for which they are legally responsible.

67.     As a direct and proximate result of the Individual Defendants' abuse of control, XM has sustained significant damages.

68.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

69.     Plaintiff, on behalf of XM, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Gross Mismanagement

70.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

71.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of XM in a manner consistent with the operations of a publicly held corporation.

72.    As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, XM has sustained significant damages in excess of millions of dollars.

73.    Plaintiff, on behalf on XM, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

**Against the Individual Defendants for Waste of Corporate Assets**

74.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

75.    As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused XM to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

76.    As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

77.    Plaintiff, on behalf of XM, has no adequate remedy at law.

### FIFTH CAUSE OF ACTION

**Against the Individual Director Defendants for Unjust Enrichment**

78.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

79.    By their wrongful acts and omission, the Individual Defendants were unjustly enriched at the expense of and to the detriment of XM.

80.    Plaintiff, as shareholder and representative of XM, seeks restitution from the Individual Defendants, and seeks an order this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

### SIXTH CAUSE OF ACTION

**Against the Individual Director Defendant Panero and Haywood for Insider Selling**

81.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

82.    At the time of Defendants' stock sales set forth herein, Defendants knew the information described above and sold XM common stock on the basis of such information.

83.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold XM common stock.

84.    Defendants' sale of XM common stock, while in possession and control of this material adverse non-public information was a breach of his fiduciary duty of loyalty and good faith.

85.    Since they used the Company's proprietary information for their own gain, this constitutes a breach of the Insider Selling Defendant's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendants obtained thereby.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.      Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive  relief as permitted by law, equity and state statutory provisions  sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding to XM  restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,


_____
**s/Kimberly A. Chadwick, Esquire**
District of Columbia Bar No. 47717
DOHERTY, SHERIDAN & PERSIAN LLP
8408 Arlington Blvd., Suite 200
Fairfax, VA  22031
Telephone:  (703) 698-7700
Fax:  (703) 641-9645
kchadwick@dsp-law.com

-and-

**s/ William B. Federman, Esquire**
District of Columbia Bar No. 390425
FEDERMAN & SHERWOOD
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone:  (405) 235-1560
Fax:  (405) 239-2112
wfederman@aol.com

Attorneys for Plaintiff



DATED:  May 5, 2006