## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BOOTH FAMILY TRUST, derivatively on behalf of Nominal Defendant XM Satellite Radio Holdings, Inc.** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.  06-cv-00833** |
| **GARY M. PARSONS, HUGH PANERO, NATHANIEL A. DAVIS, THOMAS J. DONOHUE, EDDY W. HARTENSTEIN, GEORGE W. HAYWOOD, CHESTER A. HUBER, JR., JOHN MENDEL, JARL MOHN JACK SHAW, STEPHEN COOK, JOSEPH M. TITLEBAUM AND STELIOS PATSIOKAS,** | ) ) ) ) ) ) ) ) ) | |
| **Defendants,** | ) ) | |
| **and** | ) ) | |
| **XM SATELLITE RADIO HOLDINGS, INC.,** | ) ) | **JURY TRIAL DEMANDED** |

## AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by its attorneys, submits this Verified Shareholder Derivative Complaint.

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff for the benefit of Nominal Defendant XM Satellite Radio Holdings, Inc. ("XM," "XM Satellite" or the "Company") against Defendants Gary M. Parsons ("Parsons"), Hugh Panero ("Panero"), Nathaniel A. Davis, ("Davis"), Thomas J. Donohue ("Donohue"), Eddy W. Hartenstein ("Hartenstein"), George W. Haywood ("Haywood"), Chester A. Huber, Jr. ("Huber"), John

Mendel ("Mendel"), Jarl Mohn ("Mohn"), Jack Shaw ("Shaw"), Stephen Cook ("Cook"), Joseph M. Titlebaum ("Titlebaum") and Stelios Patsiokas ("Patsiokas") for breaches of their fiduciary duties owed to XM from July 28, 2005 through the present (the "Relevant Period").[1]

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

3.     This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

4.     Venue is proper in this district because a substantial portion of transactions and wrongs complained of herein occurred in this district.  Further, Defendants either reside or participated in board of directors meetings or maintain executive offices in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business in this district.  Further, XM maintains its principal place of business in this district.

## PARTIES

5.     Plaintiff, Booth Family Trust, as set forth in its Verification, attached hereto, is and was during the Relevant Period, a shareholder of XM.  Plaintiff is a citizen of the State of New Jersey.

---

[1]  Because the Defendant Directors of XM have failed to take action to remedy the breaches of fiduciary duties that occurred between July 28, 2005 and February 15, 2006, the Relevant Period continues through this day instead of ceasing on February 14, 2006, the day before the public became aware of the wrongdoings at the Company.

6.      Nominal Defendant XM provides a satellite radio service in America, broadcasting live daily shows from several venues including Washington, D.C., with a lineup that includes more than 150 digital channels of choice from coast to coast.  XM bills itself as the leader in satellite-delivered entertainment and data services from the automobile market.  XM has yet to report a profit.  Thus, XM's value and, thus, the value of its stock is based principally on the number of subscribers it reports and the costs of acquiring those subscribers.  In XM's quarterly reports filed with the SEC on Forms 10-Q, during the Relevant Period, Defendants stated that "the key metrics we use to monitor our business growth and operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Costs Per Gross Addition ("CPGA")."  Accordingly, when XM releases it financial results, it reports the specific dollar amount of SAC and CPGA and the market looks to these costs, as well as the number of ending subscribers as the key factors assessing the value of XM and its stock price.    XM is incorporated in the State of Delaware and its principal executive offices are located at 1500 Eckington Place NE, Washington, DC.

7.      Throughout the Relevant Period, the Defendants disseminated a series of false and misleading statements that misrepresented that XM was able to reduce the costs of its new subscribers as it reached its goal of 6 million subscribers by year end 2005.  In reality and as known to or recklessly disregarded by Defendants, XM would be forced to spend, and in fact was spending, extraordinarily large sums of money in the fourth quarter of 2005, in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to Defendants since before the beginning of the Relevant Period.  Despite Defendants' knowledge that XM would be making those huge expenditures in the fourth quarter

of 2005, Defendants failed to disclose that XM's cost of subscriber acquisition would rise, and was in fact rising, to extraordinary levels, leading to huge increases in XM's net losses, which was a complete reversal of the trends of declining subscriber acquisition costs and net losses Defendants were reporting and touting throughout the Relevant Period.

8.      Defendant Gary M. Parsons ("Parsons") is a citizen of the State of California. Parsons, at all relevant times, served on the Company's Finance Committee and was and is the Chairman of the Company's Board of Directors.  Parsons has served as a director of the company since May 1997.  Parsons is also the Company's former Chief Executive Officer. Parsons is an employee of XM Satellite and, according to the Company's SEC filings, is not an independent director under the listing standards of the NASDAQ stock market.

9.      Defendant Hugh Panero ("Panero") is a citizen of the District of Columbia. Panero, at all relevant times, served as the Company's President and Chief Executive Officer and a member of its Board of Directors.   He has held these positions since June 1998.  Panero also served on the Company's Finance Committee. Panero is an employee of XM Satellite and, according to the Company's SEC filings, is not an independent director under the listing standards of the NASDAQ stock market.

10.      Defendant Nathaniel A. Davis ("Davis") is a citizen of the District of Columbia. Davis, at all relevant times, served on the Company's Audit Committee and Nominating Committee and was and is a member of the Company's Board of Directors.  Davis has served as a director of the Company since October 1999.

11.      Defendant Thomas J. Donohue ("Donohue") is a citizen of the State of Virginia. Donohue, at all relevant times, served on the Company's Compensation and Nominating

Committee and was and is a member of the Company's Board of Directors. Donohue has served as a director of the Company since October 1999.

12.     Defendant Eddy W. Hartenstein ("Hartenstein") is a citizen of the State of Connecticut. Hartenstein, at all relevant times, served on the Company's Audit Committee and was and is a member of the Company's Board of Directors. Hartenstein has served as a director of the Company since May 1995.

13.     Defendant George W. Haywood ("Haywood") is a citizen of the State of New York. Haywood, at all relevant times, served on the Company's finance committee and was a member of the Company's Board of Directors. Haywood served as a director of the Company from May 2004 until his resignation on October 3, 2006.

14.     Defendant Chester A. Huber ("Huber") is a citizen of the State of Michigan. Huber, at all relevant times, was and is a member of the Company's Board of Directors. Huber has served as a director the Company since January 2002. Huber is also the President of OnStar Corporation, a division of General Motors Corporation, a financier and business partner of the Company.    According to the Company's SEC filings, Huber is not an independent director under the listing standards of the NASDAQ stock market.

15.     Defendant John Mendel ("Mendel") is a citizen of the State of California. Mendel, at all relevant times, was and is a member of the Company's Board of Directors. Mendel has served as a director of the Company since May 2005. Mendel is also Senior Vice President, automobile operations of American Honda Motor Company, a large shareholder and business partner of the Company.    Mendel is not an independent director under the listing standards of the NASDAQ stock market.

16.     Defendant Jarl Mohn ("Mohn") is a citizen of the State of Ohio. Mohn, at all relevant times, served on the Company's Compensation and Finance Committee and was and is a member of the Company's Board of Directors. Mohn has served as a director of the Company since May 2004.

17.     Defendant Jack Shaw ("Shaw") is a citizen of the State of Indiana. Shaw, at all relevant times, served on the Company's Audit, Compensation, and Nominating Committees and was and is a member of the Company's Board of Directors. Shaw has served as a director of the Company since May 1997.

18.     Defendant Stephen Cook ("Cook") has served as the Company's Senior Vice President, Sales and Marketing since February 1999 and was promoted to Executive Vice President, Sales and Marketing in January 2002. Cook is believed to be a citizen of the District of Columbia and not a citizen of New Jersey.

19.     Defendant Stelios Patsiokas ("Patsiokas") has served as the Company's Senior Vice President, Technology since October 1998 and was promoted to Executive Vice President, Engineering and Technology in January 2002. Patsiokas is believed to be a citizen of Florida and not a citizen of New Jersey.

20.     Defendant Joseph M. Titlebaum ("Titlebaum") has served as the Company's General Counsel and Secretary since September 1998. Titlebaum is believed to be a citizen of the District of Columbia and not a citizen of New Jersey.

21.     At the time this lawsuit was filed, XM's Board of Directors consisted of ten (10) members - - Defendants Parsons, Panero, Davis, Donohue, Hartenstein, Haywood, Huber, Mendel, Mohn and Shaw. These Defendants are referred to collectively as the "Director

Defendants" or "Defendant Directors."  Each of these Defendants, except Haywood who resigned from the Board in October 2006, comprise XM's current Board of Directors.

22.    Defendants Parson, Panero, Davis, Donohue, Hartenstein, Haywood, Huber, Mendel, Mohn, Shaw, Cook, Patsiokas and Titlebaum are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of XM's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of or for the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of or for their personal interests or benefit.  Each director and officer of the Company owes to the Company

and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

24.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

25.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies and practices and controls of the Company. By virtue of such duties the Individual Defendants were required to, among other things:

      a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.    exercise good faith in taking action to correct any misconduct and prevent its recurrence when placed on notice of improper or imprudent conduct by the Company and/or its employees.

26.    The Individual Defendants were responsible for maintaining and establishing adequate internal controls for the Company and to ensure that the Company complied with all applicable state and federal laws.

27.    Moreover, as stated in Audit Committee charter, the members of the Company's Board of Directors' Audit Committee had and have the responsibility for:

**Review of Interim financial statements and earnings releases.** Review with management and, as appropriate, the independent accountants,

> earning results and earnings guidance before they are released and the
> interim financial statements before they are filed with the SEC or other
> regulators.

28.     As set forth below the Individual Defendants violated these duties and abdicated their oversight responsibilities to the Company. As a result, the Company has been named as a defendant in and exposed to millions of dollars of liability from securities class action lawsuits, as well as an SEC investigation into the Company's conduct, and has incurred and will continue to incur legal, accounting and other expenses as a result. In addition, Defendants Panero and Haywood, and other XM insiders, have reaped millions of dollars in illicit insider trading profits through the sale of their personally held shares of the Company's stock during the Relevant Period. In particular, Panero alone pocketed more than $11,800,000 from the sale of 99% of his then held Company shares.

29.     As further alleged herein, XM's Board of Directors presently and at the time this lawsuit was filed, was unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to oversee the Company's compliance with legally mandated disclosure standards and systemic failure to assure that a reasonable information and reporting system existed, and/or (2) are not independent of members of XM's Board of Directors who are interested in that they face a substantial likelihood of liability for their breaches of fiduciary duties.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

### 1.    XM's Early Years

30.    XM Satellite Radio Inc. was incorporated on December 15, 1992 in the State of Delaware for the purpose of operating a digital audio radio service under a license from the Federal Communications Commission. Defendant XM was formed as a holding company for XM Satellite Radio, Inc. on May 16, 1997.

31.    XM provides satellite delivered digital music, talk shows, sports broadcasts and special events. Subscribers receive channels of music and audio content via satellite for a set monthly subscription fee. In early 2001, XM launched its first two satellites, XM-1 and XM-2, and a third satellite, XM-3, was launched in February 2005. The Company commenced commercial operations in two markets on September 25, 2001 and completed its national rollout on November 12, 2001 when it began offering satellite radio service to consumers throughout the country.

32.    XM derives its subscribers from two primary sources: various retail outlets and original equipment manufacturers, or OEMs. On the retail side, XM sells radios and subscription services at various consumer electronics retailers, such as Best Buy, Circuit City, Wal-Mart and other national and regional retailers. On the OEM side, XM enters into partnerships with various automobile companies through which XM Radio is offered in various makes and models at the time of purchase or lease. According to the Company, "[b]road distribution of XM Radio through the new automobile market is a central element of our business strategy."

33.    More to the point, XM enjoys a cozy relationship with General Motors ("GM") and Honda, which, in addition to certain strategic partnerships, also serve as major investors in XM. To be sure, according to a former Financial Analyst who worked for the Onstar division of GM, GM is XM's largest shareholder and there "would not be an XM without GM." Moreover,

a former Regional Sales Manager pointed out that most of the money to launch XM was "put up" by the Company's largest shareholders, who also happen to be XM customers and partners – GM and Honda. The former Financial Analyst explained that GM "enabled" XM to achieve the level of success that XM has so far been able to claim by essentially creating the OEM market for XM.[2]

34.    XM's only competition in the satellite radio market is Sirius. Sirius launched service in selected markets on February 14, 2002 and nationwide on July 1, 2002. Because of its almost one year head start, XM initially enjoyed a considerable advantage over Sirius in terms of technological advances, subscriber numbers and brand awareness.

35.    By late 2003, however, competition between XM and Sirius intensified. Indeed, at that time, Sirius struck a significant blow when it outbid XM for the rights to broadcast National Football League games.

36.    Then, in October 2004, Sirius announced a deal to broadcast the daily radio show of shock jock Howard Stern beginning on or around January 1, 2006. This was a significant deal for Sirius as Howard Stern was the No. 1 national radio host among males 18-49 years of age. Indeed, Sirius characterized landing Howard Stern as a "landmark deal" that would provide Sirius with "significant potential to accelerate growth."

37.    XM was obviously disappointed by the news that Howard Stern had signed on with Sirius because XM had initially, but unsuccessfully, courted him to broadcast his show on

---

[2]    On September 26, 2006, a Consolidated Class Action Complaint was filed in the related securities class action lawsuit, *In re XM Satellite Radio Holdings Securities Litigation,* No. 1:06-cv-00802-ESH. The information alleged herein that is attributable to former employees of the Company was developed by and through the investigation of the plaintiffs' class action attorneys in the related securities class action lawsuit. Plaintiff herein obtained such information from the Consolidated Class Action Complaint filed in that action.

XM Radio. Nevertheless, XM went to great efforts to downplay the impact of this announcement on its business, despite the fact that the addition of Howard Stern to Sirius' lineup was thought by some to be the most significant event in satellite radio's short history. For example, in an April 28, 2005 interview with *TheMotleyFool.com,* Panero stated:

> I don't know if it is a good move for Sirius. It is clearly a very good move for Howard Stern. He is a smart guy and he has obviously done a deal that is very good for him. I think that there will be a number of ... his hardcore fans who will subscribe to listen to him in that environment.
>
> Whether it is a good business deal, I think time is going to tell. It is a lot, a lot of money. I had also spoken to Howard and some of his people and there was some interest in us doing some sort of a deal with him, but I never, ever contemplated a deal of that magnitude. That is more money than people like Oprah Winfrey make. That is more money than some of the biggest stars that exist. It is quite a gamble, but it was clearly a very good business deal for Howard Stern.

38.    Thus, although, in the time leading up to the Relevant Period, XM continued to maintain its lead over its competitor, Sirius was steadily chipping away at XM's market share and erasing the benefits XM enjoyed from its one-year head start. As a result, Defendants knew that, in order to effectively compete with the media blitz that would accompany the start of Howard Stern's radio show on Sirius, XM would have to massively ramp up its own advertising, marketing, and promotional efforts, thereby substantially increasing its subscriber acquisition costs, and, consequently, decreasing the value of its stock.

### 2.    XM's Subscriber Metrics

39.    XM has never turned a profit, nor is it expected to for a number of years. To the contrary, since the Company's inception, it has lost hundreds of millions of dollars as satellite radio attempts to gain a foothold in an already crowded consumer entertainment market. As a result, in reporting its financial results to the market, XM focuses its attention, as well as the attention of the

market, on a number of self-created subscriber-related metrics designed to demonstrate that it is heading in the right direction. To be sure, those metrics are essential to the value of XM's stock and are closely watched by shareholders and analysts alike.

40.    For example, at various times, the Company reports on its net and gross subscriber counts, average monthly subscription revenue per subscriber, churn, subscriber acquisition costs and costs per gross acquisition. The problem, however, in relying on several of these metrics is that the actual numbers are in the sole province of the Company and can be subject to manipulation.

41.    As explained in a May 6, 2004 article entitled "XM Curdles as Churn Comes to Light" by *TheStreet.com*:

> At first glance, subscriber losses seem like a nonissue at XM. After all, the company reported Thursday that, on average, a mere 1.35% of its subscribers canceled service each month in the first quarter.

> But like the pro forma profit calculations of yesteryear, this so-called churn number can be a slippery critter. The number is calculated at the company's discretion and, as critics point out, can include whatever numbers executives choose.

> This latest wrinkle was exposed on a conference call with analysts Thursday. XM executives, responding to a question, revealed for the first time in memory a gross subscriber-addition figure. That's a figure the company hasn't routinely disclosed, preferring instead to focus on the ever-rising net figure.

> A bit of back-of-the-envelope math shows why XM hasn't been eager to share the gross-adds figure. The company says it added a total of 475,000 customers in the first quarter.

> That looks good, but recall that XM added 321,675 new subscribers in the quarter on a net basis. That means 153,325 customers somehow vanished -- putting the monthly churn at something like 3.8%, nearly three times the official count.

> That churn figure looks substantially less rosy, though XM

representatives were quick to explain why. They say their churn number excludes customers who drop the service after a three-month introduction when they buy an XM-equipped car. "We felt comfortable" disclosing the gross subscriber figure on the call rather than having analysts guess at it, says a company rep.

XM adds that it converts about 70% of these promotional users into monthly subscribers. But as observers note, all the promotional users are counted in the overall subscriber totals.

Counting freeloaders as actual customers helps XM pump up its subscriber growth and helps spread the per-gross-add costs over a much wider base, say critics. That makes it look like acquisition expenses are coming down, an important consideration at a cash-burning company.

42.     In addition, a former District Manager who was employed by XM during the

Relevant Period explained that, concerning OEM sales, vehicle purchasers often get free trial

periods of XM satellite radio service with the purchase of a new vehicle that has an XM radio

factory installed.  According to the witness, manufacturers such as Honda and GM pay for the

free trial period and offer it to their customers as an incentive toward purchasing the vehicle. The

witness noted that once an individual purchases a Honda or GM vehicle with an XM radio

installed, the free trial subscription is activated and an XM account is created for the consumer

based on the consumer's name, address, phone number, and radio identification number. The

witness said that XM counted consumers who received a free trial through the purchase of a new

vehicle as full-fledged subscribers. According to the witness, subscriptions are an easy metric to

manipulate and investors should have been paying attention to the Company's revenues and

whether the Company was cash flow positive.

43.     Of the various subscriber metrics described above that are reported to the public,

XM emphasizes two significant cost measurements that are particularly indicative of the health

of the Company. To be sure, in an April 28, 2005 interview with *TheMotleyFool.com,* Panero responded to a question about the "most important numbers" that investors should be following:

> Well, I think the numbers that I mentioned before are the ones that people focus on -- the subscriber acquisition cost, which is a subcomponent of an even more important metric, the cost per gross add. That is, basically, what is the cost to get that next subscriber? Those are the ones that we actually break out for The Street and show to them in detail. That is the big issue.

44.    According to the Company, SAC includes subsidies and distribution costs, excluding on-going loyalty payments to distribution partners, and negative margins from direct sales of merchandise, which are divided by the appropriate per unit gross additions or units manufactured to calculate what XM reports as "SAC." Moreover, CPGA includes the amounts in SAC, as well as advertising and marketing expenses, such as advertising, media and other discretionary marketing expenses.

45.    Prior to the beginning of the Relevant Period, XM repeatedly emphasized to the market that, while it sought to achieve rapid subscriber growth, it would do so in a cost effective manner. For example, during XM's February 10, 2005 conference call with analysts to discuss its fourth quarter 2004 financial results, Joe Euteneuer ("Euteneuer"), XM's Chief Financial Officer ("CFO"), stated, "We continued to build a solid business by exceeding our expectations for total lending subscribers with lower than expected CPGA costs. . . . The bottom line, XM continues to demonstrate very cost effective growth."

46.    Similarly, during the April 27, 2005 conference call to discuss XM's first quarter 2005 results, Panero stated:

> Our goals of rapid subscriber growth and manageable subscriber acquisition costs were achieved this quarter. We remain on track to meet our 2005 year-end guidance of 5.5 million subscribers and to do so in a cost effective manner.

Euteneuer added:

> XM has continued to demonstrate cost-effective growth in both its
> subscriber acquisition costs or SAC and its fully loaded cost per gross
> addition metric.

47.    Additionally, in an April 27, 2005 interview with *TheMotleyFool.com,* Panero

explained XM's goals "to hit cash-flow breakeven in 2006" and stated:

> We are still, and if you look at the metrics of the company and some of
> the key expense areas that contribute to getting to breakeven, such as
> our subscriber acquisition costs or our cost per gross ads, what the street
> has given us a lot of credit for is that we have driven those costs down.
> They are significantly lower than they were a year ago or two years ago.

48.    As demonstrated below, XM's mantra is that it is adding subscribers and keeping

SAC and CPGA low. At the root of Defendants' wrongdoing is the all-encompassing desire to

convince the market, by any means necessary, that subscriber costs would remain low.

49.    In line with its stated goal of rapid and cost effective subscriber growth, XM

reported quarter-after-quarter of declines in its SAC and CPGA metrics prior to the Relevant

Period. In fact, for 2004, the Company reported a 17% decrease in SAC and a 27% decrease in

CPGA in a year-over-year comparison to 2003 numbers. Similarly, for the first quarter of 2005,

XM reported a 22% improvement in SAC and a 15% improvement in CPGA when compared to

the results for the first quarter of 2004. The Defendants' scheme was designed to trick the market

into believing that SAC and CPGA would continue to decline when they knew that such figures

would rise appreciably during the Relevant Period.

**B.    Defendants Knew that Subscriber Costs were Going to Rise Substantially
During the Relevant Period**

50.    Despite creating market expectations of substantial subscriber growth at steadily

declining costs, XM effectively abandoned that strategy during the Relevant Period for a "growth

at any cost" approach. XM undertook this reversal of course because there was tremendous pressure to compete with Sirius and the media blitz surrounding the launch of Howard Stern's satellite radio program in January 2006. According to a former Associate Accountant who worked for XM from July 2004 to December 2005 and was responsible for approval of royalty payments, tracking expenditures, reconciling invoices and processing purchase requisitions, throughout the Relevant Period, XM was "in a frenzy to try to one-up" its prime competitor, Sirius. In fact, the witness personally witnessed Panero "in a frenzy" exhorting XM employees to sign up new subscribers. To that end, Panero frequently called impromptu meetings of all XM employees where he stressed the importance of XM's sales initiatives because "every subscriber counts."

51.    As the fourth quarter of 2005 approached, XM developed a widespread marketing campaign, called "Listen Large," that was intended to counter the heavy promotion of Howard Stern by Sirius. A former District Manager, who worked for XM from approximately August 2005 through August 2006, explained that the Listen Large campaign was designed to advertise the fact that XM had a wider array of musical and broadcasting content than Sirius. Reportedly costing the Company more than $25 million, the campaign included "plastering" XM's name in a variety of posters, retail store displays, and kiosks throughout various malls, in addition to television commercials featuring XM's celebrity broadcasters that would air during prime time viewing hours and during other special events such as the National Football League divisional playoffs.

52.    In reality, the former District Manager indicated, instead of the $25 million reportedly spent, XM actually spent somewhere between $100 million and $150 million on the Listen Large campaign during the fourth quarter of 2005. Thus, the former District Manager commented that, because the Listen Large campaign was so expensive, any subscriber gains achieved by XM came at a significant cost.

53.    Based upon the statements of the confidential witnesses cited above, XM spent between $25 million and $150 million on the Listen Large campaign. Accordingly, Defendants knew or recklessly disregarded that the costs and expenses involved with the Listen Large campaign would cause a direct increase to XM's CPGA. In other words, Defendants knew or recklessly disregarded the fact that the Listen Large campaign, which was necessary to achieve XM's stated 6 million subscriber goal, would cause a huge increase in CPGA during the fourth quarter of 2005.

54.    In this regard, a former SVP of Human Resources employed at XM during the Relevant Period commented that the major marketing and subscriber growth initiatives undertaken during the fourth quarter of 2005 (including Listen Large) had been fully budgeted well in advance because it was known as early as October 2004 that Howard Stern would begin broadcasting on Sirius in January 2006. The witness said these costs could simply not be viewed as any kind of a surprise or unanticipated event.

55.    Despite the extraordinary amount spent on the Listen Large marketing campaign, XM narrowly missed its subscriber goals for 2005. As a result, the former District Manager said that XM, led by Panero, fired its entire marketing team in early 2006 because the campaign had been so expensive, and was not as effective as management believed it should have been.

56.    In addition to the tremendous amount of money spent on advertising at the national level during the Relevant Period, XM poured money into its advertising efforts on the local level. According to a former Regional Sales Manager who was employed by XM from December 2004 to November 2005 and was responsible for overseeing numerous retail sales personnel, XM was "spending fortunes" on advertising and merchandising at retail locations, even though it was readily apparent to the witness that the retail store personnel did not care about

selling XM satellite radio. According to the witness, XM "wasted a lot of money" on so-called point-of-purchase displays, which were promotional displays set up on the premises of retail stores like Best Buy that sold XM radios.

57.    This former Regional Sales Manager noted that, although XM had always been able to meet and/or exceed its subscriber goals while reducing its costs per subscriber acquisition, this situation changed dramatically during the second half of 2005, as XM's costs for attaining and retaining subscribers began to increase due to, among other things, increased advertising expenditures, including merchandising programs in retail stores (such as point of purchasing displays and giving away radios to leading sales personnel in the retail stores).

58.    XM's strategy for competing with Sirius by "any means necessary" was not limited to huge advertising expenditures, however. Numerous witnesses, such as the former Associate Accountant, explained that XM drastically reduced the price of its radios during the Relevant Period as an incentive for consumers to subscribe with XM for satellite radio service. To be sure, a former Regional Account Manager of Sales and Activations who worked for Alloy Mall Marketing ("Alloy"), a company retained to sell XM Radio at mall-based kiosks across the country, commented that, in an effort to gain subscribers, XM directed Alloy to offer steep "subsidies" on radios such that they would be offered to consumers at significantly reduced prices. This was further corroborated by a former District Activation Manager who, while working for XM assisting retailers in selling XM products and services during 2005, noted that XM essentially gave customers radios normally valued at $300-400 for free in order to get them to sign up for XM service. Finally, a former Regional Sales Manager concluded that XM "subsidized" the cost of the radios it sold in retail stores like Circuit City and Best Buy.

Case 1:06-cv-00833-ESH    Document 16    Filed 11/30/2006    Page 20 of 61


Defendants knew that offering large subsidies and rebates in this manner would cause XM to experience a substantial increase in subscriber acquisition costs during the Relevant Period.

59.     These acquisition cost increases were further exacerbated by the fact that XM had been experiencing product supply shortages prior to and during the Relevant Period. In this regard, Delphi, XM's primary supplier of radios, was facing severe financial and operational difficulties, which, according to a former National Account Manager who worked for Alloy during the Relevant Period, meant that Delphi was "having trouble producing enough equipment to meet demand." The witness said that product shortages and resulting rebate issues escalated in the fourth quarter of 2005.

60.     For example, according to this former National Account Manager, who was responsible for overseeing the operations of Alloy's XM kiosks in malls across the U.S., the delayed launch of Delphi's "MyFi" and the unavailability of certain accessories for Delphi's "SkyFi" and "Roady" radios meant that XM had to rebate the radios and offer promotional programs to keep subscribers interested. These "subsidies" included: (1) offering rebates of $50 and $35, as well as free accessories, which were covered "100 percent" by XM; (2) giving away certain hardware accessories, such as power cords, for free; and (3) offering free activation, a reduced activation price, or three-months free service. All of these "subsidies" directly impacted and increased XM's metrics. Defendants knew this by virtue of simple math.

61.     This witness further noted that, in November and December 2005, XM offered a program in which the Company represented that XM's "Christmas gift to the consumer" was free activation on the SkyFi and MyFi radios, and three-months free service. However, the witness said that the only products that Alloy was able to make available to customers around Christmas 2005 were the old Roady products, which meant that XM was rebating and offering free products

"left and right" in order to entice disappointed customers to take the Roady. Accordingly, the witness understood that that the subsidies (i.e., rebates and promotions) that XM had to pay in order to appease customers who wanted product that was unavailable was a "major contributing factor" to rising costs at XM. The witness explained that Alloy representatives discussed XM's inventory and rebate issues with XM representatives on numerous occasions.

**C.    Defendants' False and Misleading Statements Made During the Relevant Period**

62.    On July 28, 2005, XM issued a press release entitled "XM Satellite Radio Holdings Inc. Announces Second Quarter 2005 Results and Increases Year-End Subscriber Guidance to 6 Million," which stated in relevant part:[3]

> **\$125 Million in Revenues More than Double Prior Year Period**
> **Ends Quarter at 4.4 Million Subs with 647,226 Net Subscriber**
> **Additions**
>
> Washington, DC, July 28, 2005 – XM Satellite Radio Holdings Inc. (NASDAQ: XMSR) today reported financial and operating results for the second quarter ended June 30, 2005. For the quarter, XM reported revenue of \$125 million, an increase of 136 percent over the \$53 million reported in the second quarter 2004. The significant revenue growth was driven by record second quarter net subscriber additions of 647,226, a 55 percent increase over the 418,449 subscribers added in the second quarter 2004. XM ended the quarter with 4,417,490 subscribers compared with 2,100,352 subscribers reported for the second quarter 2004.
>
> *With XM's first half performance and an even stronger outlook for the second half of the year, XM is increasing 2005 subscriber guidance from 5.5 million to 6 million ending subscribers.*
>
> XM's net loss for the second quarter 2005 was (\$146.6) million, as compared to (\$166.1) million in the second quarter 2004. XM reported an EBITDA loss of (\$89.9) million for the second quarter 2005 compared to (\$107.8) million for the second quarter 2004. XM's net loss and EBITDA for the second quarter 2004 each included a (\$35.0) million charge for de-leveraging activities.

---

[3]    Unless otherwise indicated herein, all emphasis is added.

*Efficient Quarterly Subscriber Growth*

XM's second quarter subscriber growth was strong across both the retail aftermarket and automotive distribution channels. Second quarter 2005 Cost Per Gross Addition (CPGA) was $98, an improvement of $3, or 3 percent, from the $101 CPGA reported in the second quarter 2004. XM's CPGA is the fully-loaded cost to acquire each new subscriber, including Subscriber Acquisition Costs (SAC) of $50, as well as advertising and marketing expenses.

63.     On July 28, 2005, XM hosted a conference call to discuss its Second Quarter 2005 earnings and financial outlook. Panero, Joe Titlebaum, General Counsel of XM ("Titlebaum"), Parsons, Chairman of the Board, Euteneuer, and Steve Cook, Executive Vice President of Sales and Marketing ("Cook"), participated in the call on behalf of XM. During the call, Defendant Panero made or otherwise failed to correct numerous false and misleading statements designed to artificially inflate XM's stock price. For example, Panero stated:

This morning, we will review XM's results for the second quarter 2005, one of the most successful quarters in XM Satellite Radio's history. Obviously, the growth in subscribers and revenue were strong this quarter, but we will also look at the underlying economics of the business and our strategic initiatives to see what really makes this quarter stand out.

\*          \*          \*

Now let's look at the most significant quarterly growth indicator, net subscriber additions. XM's subscriber growth continues to climb rapidly, surpassing the 4 million subscriber mark in May. In 23 months, XM reached 1 million subscribers. Eight months later we reached our second million. Six months later, 3 million, and then in less than five months, XM exceeded 4 million subscribers. ***Based on our performance in the first half of the year and continued strong demand for our service, we are increasing year-end subscriber guidance from 5.5 million subscribers to 6 million year-end subscribers.***

\*          \*          \*

For the second quarter 2005, XM reported total revenues of 125 million, an increase of 136% compared to 53 million one year ago. We exited the second quarter with an annualized total revenue run rate of almost $550

million. ***Although we are quite pleased with the progress of our revenue growth, the more important long-term question is what did it cost to generate this increase of 136%. On this front, the news is also good.*** XM's fully loaded per unit cost of capturing a new subscriber, or CPGA, was $98 for the second quarter of 2005, an improvement of 3% from the [$]101 CPGA reported a year ago.

Subscriber acquisition costs, or SAC, a component of CPGA, were $50 per gross connect for the second quarter of 2005, improving 12% from $57 a year ago. Joe will discuss the second-quarter figures in more depth later.

\*        \*        \*

In summary, during the last few months XM has combined excellent business execution with a series of strategic moves to ensure even greater breadth of bandwidth, content, and geographical scope for the Company in the future. Operationally, we continue to have excellent execution and leadership across three key areas, content, technology, and distribution. ***And the ultimate test, we are achieving rapid growth with sound financial performance.***

64.    As the conference call continued, Euteneuer, XM's CFO, added the following:

***XM's targeted and efficient marketing efforts have enabled us to continue demonstrating cost-effective subscriber growth and improvements both in the direct costs to gain a subscriber, or SAC, and the fully-loaded total cost, including discretionary advertising and marketing costs, to gain a subscriber, or CPGA.*** (indiscernable) SAC for the second quarter of 2005 was a modest $50 per gross addition, a decline of $7, or 12%, from the $57 per gross addition in the second quarter of 2004.

CPGA for the second quarter of 2005 was $98 per gross addition, a $3 improvement, or 3%, from the $101 reported in the second quarter of 2004. ***We expect CPGA to remain stable during the second half of the year.***

***I would like to close by updating guidance for 2005. As Hugh [Panero] stated earlier, given XM's strong subscriber acquisition performance during the first half of 2005, we are raising our year-end 2005 subscriber guidance by 0.5 million subs, from 5.5 million to 6 million subscribers. This new target better reflects the momentum of XM subscriber growth and the strong second half of the year we expect.***

We are also increasing subscriber revenue guidance for the year from 480

million to 500 million. This increased subscriber growth target affects
dividend, so we are revising our guidance on EBITDA loss from 360
million to 395 million. We still expect to achieve operational cash flow
breakeven by the end of 2006.

65.     During the question and answer session of the July 28, 2005 earnings conference

call, the following exchanges took place:

> Barton Crocket:
>
> I wanted to ask you a question about the outlook for the fourth quarter and
> then going into the beginning of next year, when your competitor is going
> to have Howard Stern coming in and you have just raised your sales
> forecast for the end of the year. Do you see Howard Stern as potentially a
> risk to your sub estimate in terms of if he turned out to be very popular, he
> could take some of the momentum out of what you're seeing right now in
> terms of sub growth? Or do you see it as more of an opportunity in terms of
> increasing exposure for the whole category?
>
> \*        \*        \*
>
> Unidentified XM Representative:
>
> ***On the Howard Stern question, clearly, we would not be upping our
> guidance if we thought that there was an issue with regards to how he
> would affect demand for our product.*** Clearly, the announcement of
> Howard Stern has been in the marketplace for almost 1.5 years now, so we
> have seen no effect of that at all during that period, as we have not seen any
> effect by the other content that they offer. That has been around for awhile,
> so we continue to have strong demand. And Howard Stern has his positives
> and his negatives as is associated with consumers, and it will play out the
> way it plays out. I think people will migrate who are Howard Stern fans
> and then other people will basically have an unfavorable view of him being
> associated with that product and they will choose what company they want
> to participate with.
>
> Unidentified Speaker:
>
> I had three questions. Just quickly, Joe, you indicated that you expected
> CPGA to be consistent with the second quarter for the balance of the year.
> Does that also apply to what you expect for SAC, the SAC component of

that?

*     *     *

Unidentified XM Representative:

That kind of a range of different ones . . . The second item, before Joe
addresses the SAC and CPGA question, *because we do think CPGA will
be stable,* and you can see SAC bounce around a bit depending upon what
your actual hardware subsidy elements are on any given time frame. That is
the reasons we try to focus on somewhat the broader and more
comprehensive, and, in our view, more accurate measure, which is the
CPGA.

*The only other point I really am kind of compelled to make on the whole
SAC and CPGA issue as well too is, when we show "year-over-year"
results comparing ourselves to last year, it is actually pretty important to
remember last year was some pretty damn good numbers. If you look as
the fact that last year's second quarter we added 418,000 net new
subscribers at basically a 50-50 mix of retail and OEM. But the part that
often gets lost in that is when we did that, at that level of volume, our
SAC was $57 and our CPGA was $101.*

So we had some pretty tough, challenging, good performance from last
year, and our belief is that this is clearly a significant improvement. We
were over 60% contribution margin then. So even a year ago in time
frame, when we were doing volumes more in the 400,000 level, we were
doing so with positive economic efficiency and capability built in . . . .

66.    In response to XM's Second Quarter 2005 earnings announcements, analysts

proclaimed a very positive outlook for XM, citing to XM's ability to increase subscriber guidance

while keeping its SAC and CPGA under control:

(a)    SG Cowen & Co. stated on July 28, 2005 that XM's SAC of $50 "come

in much better than our $63 est." and that "CPGA of $98 beat our $100 est." On July 29, 2005,

SG Cowen & Co. analysts reported that "XM reported another solid quarter, outperforming on

almost every metric . . . *SAC and CPGA came in well ahead of expectations.* This cost

reduction came despite record sub growth, a recent price increase and an aggressive promotion

period."

(b)      Hoefer & Arnett reported on July 28, 2005 that "XM reported an EBITDA loss of $89.9 million vs. our estimate of $96 million. *The improvement was primarily attributable to a lower SAC and CPGA for the quarter.* XM successfully added 641,000 subscribers and kept CPGA in the sub $100 range."

(c)      Analysts from CIBC World Markets advised on July 29, 2005 that "[o]n the marketing side, cost per gross add (CPGA) was slightly higher than expected as a result of increased spending on advertising, while subscriber acquisition cost (SAC) was materially lower than expected. *Key metrics of SAC and CPGA were $50 and $98 vs. our estimates of $68 and $96, respectively." CIBC analysts added that because the Company expected CPGA to remain unchanged at approximately $100 per quarter, "[t]his implies no material increase in advertising spending.* Moreover, the company expects SAC to fluctuate within 3Q and 4Q, with 3Q SAC likely higher than 2Q, as a result of a spillover from promotional Roady2 activations."

(d)      RBC Capital Market analysts commented on July 29, 2005 that "647K net subscriber additional (in-line with pre-release) were accomplished on both a lower SAC and CPGA than we (and consensus) were expecting – actual SAC of $50 versus or $63 estimate and actual CPGA of $98 versus our $99 estimate driven by improving economies of scale and efficiency in distribution."

(e)      Bear Stearns research analysts noted on July 29, 2005 that XM had raised year-end subscriber guidance to 6 million from 5.5 million, that XM's revenue guidance had been increased, and that SAC, at $50, was "significantly below our $62 estimate" and that CPGA was "in line with our $98 projection."

(f)      Analysts from Deutsche Bank Securities Inc. proclaimed that XM had *"[c]osts under control as CPGA and SAC [were] better than expected"* and that "XM reported

cost per gross activation (CPGA) of $98, nicely below our $109 estimate, and down from $101 in 2Q04. The subscriber acquisition cost (SAC) component was $50, versus our $63 estimate. The beat in SAC occurred despite the increase caused by the Roady2 promotion in the quarter. XM in fact reduced the price of the Roady2 to $49.99 in a closeout at the end of 2Q." The analysts continued: "Management indicated that it expected CPGA to be stable in the range of 2Q's $98 level, which would result in a lower full-year CPGA than our current $102 estimate. That said, depending on promotional activity we would expect SAC to vary somewhat from quarter to quarter, although we still expect it to be down for the year from $62 in 2004."

(g)     On July 29, 2005, Bernstein Research Call analysts pointed to strong subscriber growth and told investors that "XM Satellite Radio reported strong results in the second quarter, reaffirming our bullish view of their long term economics[,]" that SAC and CPGA "continue to decline nicely, despite a Buy-One-Get-One-Free promotion during the quarter." In conclusion, they stated "we find that XM is continuing to reduce its net loss as well as still accelerating subscriber net adds very encouraging. This indicates that *costs are continuing to fall (especially SAC and CPGA) even while XM sustains a very fast rate of growth.*"

(h)     Analysts from Stifel, Nicolaus & Company, Inc. reported on July 29, 2005 that XM "mentioned on its conference call that it expects subscriber costs to remain roughly the same for the rest of the year. We are slightly above management guidance to account for the potential for [Sirius] to price aggressively in retail. We think SAC will decline slightly in 2H05 when the generation 4 chipsets are introduced. Historically, the large reductions in SAC for both [XM and Sirius] have occurred amidst the introduction of cheaper smaller chipsets."

(i)     JP Morgan analysts reported the following on July 29, 2005:

XM's 2Q05 report featured solid fundamentals and guidance that we believe pushed back on bearish fears surrounding Sirius' Howard Stern deal, churn spikes from rate hikes and spending.

- By raising its yearend sub goal to 6m from 5.5m, XM is saying it sees no data or research that suggests it should be concerned that the popularity of Howard Stern on Sirius will slow XM's sub growth. On the other hand, XM's baseball deal is looking like a winner, driving 23% of retain sub growth in May and June.

- Despite a 30% rate hike, core churn remained flat sequentially at 1.4%, while overall churn including OEM promotions decline sequentially to 2.5% from 2.7%. Consumers clearly don't mind the higher rates, a testament to the appeal of the service. Total ARPU of $10.34 topped our $9.85 est, driving $5m of sales upside.

- XM raised its EBITDA loss guidance to $395m from $360m to reflect the cost of additional sub growth. We however, believe this is too conservative, and are cutting EBITDA loss to $352m from $363m. We are maintaining our year-end sub estimate at an above guidance 6.1m. *The earnings improvement is driven by lower churn and CPGA assumptions.* We continue to see FCF profits by 2006.

67.    On August 5, 2005, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending June 30, 2005, which was signed by Defendant Panero. The financial results reported in the 10-Q were substantially similar to those reported in the Company's July 28, 2005 press release. The August 5, 2005 10-Q included the following statements:

- [XM continued] to grow [its] gross margin (calculated as revenues less variable costs, which include revenue share & royalties, customer care & billing operations, cost of merchandise & ad sales) during the three months and six months ended June 30, 2005 *while reducing our costs to acquire each new subscriber*

                         * * *

    The key metrics we use to monitor our business growth and our operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Cost Per Gross Addition ("CPGA") and EBITDA, presented as follows:

                         * * *

We will continue to incur operating losses until we substantially increase the number of our subscribers. *We are focused on increasing subscribers and scaling our business while managing growth and containing costs.*

\*       \*       \*

Subscriber Acquisition Costs. We consider subscriber acquisition costs to include radio manufacturer subsidies, certain sales, activation and installation commissions, and hardware-related promotions. These costs are reported in subsidies & distribution. The negative margins from equipment sales are also included in subscriber acquisition costs. Subscriber acquisition costs do not include on-going loyalty payments to retailers and distribution partners, payments under revenue sharing arrangements with radio manufacturers and distributors and certain guaranteed payments to GM. During the three months ended June 30, 2005 and 2004 we incurred SAC expenses of $47.9 million and $31.8 million, respectively. SAC for the three months ended June 30, 2005 and 2004 was $50 and $57, respectively. The decline in SAC for the three-month period ended June 30, 2005 as compared to the three month period ended 2004 is due to the combined impacts of the decline in manufacturer subsidies and the increase in the number of activations. The timing of promotions and new contracts may cause SAC to fluctuate from period to period. *We expect SAC to decline in 2005 as compared to 2004.*

Cost Per Gross Addition. We consider CPGA to include the amounts in SAC, as well as advertising, media and other discretionary marketing expenses. In our condensed consolidated financial statements, SAC costs are captured in Subsidies & Distribution and the negative margins from equipment sales, while CPGA costs are primarily captured by the combination of subsidies & distribution, advertising & marketing, plus the negative margins from equipment sales. CPGA does not include marketing staff (included in Retention & Support) or the amortization of the GM guaranteed payments (included in Amortization of GM Liability). During the three-month periods ended June 30, 2005, and 2004, we incurred CPGA expenses of $93.2 million and $56.3 million, respectively. CPGA for the three-month periods ended June 30, 2005 and 2004 was $98 and $101, respectively. CPGA declined for the three-month period ended June 30, 2005 as compared to the three-month period ended June 30, 2004 primarily due to the combined impacts of subscriber additions increasing at a faster rate than our discretionary advertising and marketing expenses as well as the change in the mix of subscribers acquired. The timing of our media campaigns and discretionary advertising spending may cause CPGA to fluctuate from period to period. The costs to acquire subscribers vary by distribution channel, and a change in the mix of subscribers from higher cost distribution channels to lower cost distribution channels will have a

favorable impact on CPGA. *We expect CPGA to decline in 2005 as compared to 2004.*

\*       \*       \*

Our funding requirements are based on our current business plan, which in turn is based on our operating experience to date and our available resources. *We are pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs.*

68.    The statements referenced in ¶¶62 through 65 and ¶67 were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to Defendants based upon their access to and review of internal XM data, were:

- Because of Defendants' numerous statements highlighting XM's ability to pursue a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs, the market expected XM's most crucial performance metrics, SAC and CPGA, to decline, including in the second half of 2005 and as compared to 2004;

- XM misrepresented and omitted crucial facts regarding its ability to reduce the costs of adding crucial new subscribers as it attempted to reach its goal of 6 million subscribers by year-end 2005;

- As was known, or disregarded with severe recklessness, by Defendants, XM would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005 in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to Defendants since before the beginning of the Relevant Period, including the impending arrival of Howard Stern at Sirius;

- Defendants knew or were severely reckless in ignoring that XM was deeply discounting radios and offering steep subsidies in order to combat supply shortages and inflate subscription numbers during the Relevant Period, which contributed to the sharp increase in SAC and CPGA in the fourth quarter of 2005;

- Defendants knew or were severely reckless in ignoring that XM was planning to spend extraordinary sums of money as part of its Listen Large campaign in the

fourth quarter of 2005, which would cause XM's SAC and CPGA to increase dramatically and in stark contrast to the decline in SAC and CPGA that XM had reported in previous quarters; and

- Despite Defendants' knowledge that XM would be making huge expenditures in the fourth quarter of 2005, Defendants failed to disclose to the market that XM's cost of subscriber acquisition would rise to extraordinary levels, leading to huge increases in XM's net losses, which was a complete reversal of the trends of declining SAC and CPGA Defendants reported and touted throughout the Relevant Period.

69.    Like investors in the market, analysts anxiously awaited XM's reported CPGA numbers for the Third Quarter of 2005. Indeed, analysts from JP Morgan stated on October 5, 2005: "We believe the next keys for the stock should be CPGA and churn numbers disclosed in the earnings call, likely to be in late October."

70.    On October 27, 2005, XM issued a press release entitled "XM Satellite Radio Holdings Inc. Announces Third Quarter 2005 Results and Reaffirms 6 Million Subscriber Guidance," which stated in relevant part:

> **Revenues up 134% to $153 million in third quarter, compared to prior year period;**
>
> **Subscribers double to 5,034,642 from prior year; Expands lead with 617,152 net additions**
>
> **GM and Honda to produce more than 2 million 2006 XM-equipped vehicles**
>
> Washington D.C., October 27, 2005 – XM Satellite Radio Holdings Inc. (NASDAQ: XMSR) today reported financial and operating results for the third quarter ended September 30, 2005. XM ended the quarter with 5,034,642 subscribers, doubling the 2,516,023 subscribers reported last year for the third quarter. The growth was driven by third quarter net subscriber additions of 617,152, a 48 percent increase over the 415,671 net subscribers added in the third quarter 2004. *Given its strong performance in the first three quarters, XM reaffirms its guidance of exceeding 6 million subscribers by the end of 2005.*
>
> XM's net loss for the third quarter 2005 was ($131.9) million, as compared to ($118.0) million in the third quarter 2004. XM reported an

EBITDA loss of ($73.8) million for the third quarter 2005 compared to a third quarter 2004 loss of ($62.9) million.

### Record Revenue from Cost-Effective Subscriber Growth

For the quarter, XM reported revenue of $153 million, an increase of 134 percent over the $65 million reported in the third quarter 2004. XM's third quarter subscriber growth was driven by strong automotive and retail distribution performance with a range of full-featured products. Subscriber Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease from the $57 in the third quarter 2004. Cost Per Gross Addition (CPGA) in the third quarters of both 2005 and 2004 was $89. *XM products are well stocked for the holiday season and XM expects to accelerate its subscriber and revenue growth through the fourth quarter.*

71. On October 27, 2005, XM hosted a conference call to discuss its Third Quarter 2005 Earnings and financial outlook. Panero, Titlebaum, Parsons, Euteneuer, and Cook participated in the call on behalf of XM. During the call, XM executives, including Defendant Panero, made numerous false and misleading statements designed to artificially inflate XM's stock price. For example,

Panero stated:

XM's subscriber growth rate is reflected in the Company's rapidly increasing revenue, reaching a record 153 million in the third quarter of 2005 with subscription revenue of 140 million. Third-quarter revenue more than doubled to 65 million in revenue reported in the third quarter of 2004, and is 22% more then the 125 million recorded in the second quarter of this year.

*The secret to XM's smart subscriber growth rather than growth at any cost is the ability to control marketing and product expenses while rapidly growing subscribers. This quarter, XM kept its fully loaded per unit costs of capturing a new subscriber, or CPGA, constant at $89 – the same CPGA we reported in the third quarter last year.* These results provide us the flexibility to aggressively advertise and market our service in the fourth quarter. And in fact, that is what we are doing – implementing a comprehensive media campaign comprised of advertisements, rebates, and other promotional techniques to fully exploit the holiday selling season again this year.

\*      \*      \*

So, in summary, the third quarter 2005 represents another quarter of XM market leadership and ***smart subscriber growth.*** XM's leadership in the OEM and retail channels resulted in it ending the quarter with more than twice as many subscribers as its competitor, our revenue rapidly increased, cost-effective programming additions broadened our appeal, new products are in flow, and strategic partnerships are on track. ***We strengthened our foundation for a spectacular fourth quarter when we will exceed 6 million subscribers*** and for an exceptional 2006 and beyond.

72.    As the Third Quarter 2005 earnings conference call continued, Euteneuer stated:

Now let's move to revenue. Total revenue increased 134% to 153 million for the third quarter of 2005, from 65 million reported in the third quarter of 2004. Recurring subscription revenue of 140 million for the third quarter of 2005 increased 135%, from 60 million in the third quarter of 2004. Compared to the second quarter 2005, subscription revenue was up 23%, reflecting the continued significant growth in our subscriber base . . . .

\*          \*          \*

***XM's targeted and efficient sales and marketing efforts have enabled us to continue to demonstrate cost-effective subscriber growth, both in the direct cost to gain a subscriber, or SAC, and the fully-loaded total cost, including discretionary advertising and marketing costs, to gain a subscriber, or CPGA.***

XM's SAC for the third quarter was a modest $53 per gross addition, a decline of $4 or 7%, from the $57 per gross addition in the third quarter 2004. CPGA for the third quarter 2005 was $89 per gross addition, unchanged from the third quarter 2004 and down from the $98 in the second quarter 2005. Similar to past trends, we expect fourth quarter SAC and CPGA to increase due to greater media and promotional activities during the upcoming holiday season.

\*          \*          \*

In summary, the strong progress we've made in the third quarter enables me to ***reaffirm the 2005 guidance that we had previously given.*** XM expects to report 500 million in subscription revenue and EBITDA loss of 395 million for 2005, while ***ending the year with over 6 million subscribers.*** In addition, XM still expects to achieve operational cash flow breakeven by the end of 2006. We will issue our next subscriber update in the first week of January.

73.    During the question and answer session of the October 27, 2005 earnings conference call, the following exchanges took place:

> Barton Crockett:
>
> You guys seem to have stepped up the level of rebating for your radios going into the holiday season. We haven't seen you guys be a significant rebater for much of this year. What could that do – can you give us some sense of your early outlook on what that could do for ARPU, what the likely uptake is, and whether this is kind of a switch in strategy for you guys more towards rebating and less towards other ways of spending on subscriber acquisition? So, that is my main question right now.
>
> Steve Cook:
>
> Sure, I'll handle that. It really won't affect ARPU at all because we don't tie the rebate to a service commitment. It's really a hardware-only rebate. And really our intent there is we're reaching the point where we can start to hit lower and lower price points to really penetrate the mass-market. Because this is – we do see this as a gigantic business as we're shooting towards 10 million by 00 or 20 million by 2010 and that sort of thing. *So, we can maintain our SAC at very reasonable levels and still hit some of these attractive consumer price points. So – and Christmas – the gift-giving season is the perfect time to do that. So, that is really what you are seeing.*
>
> Barton Crockett:
>
> Just to clarify, you're saying because you're not requiring people to sign up for a six-month or one-year, you're not going to have this in ARPU, but it's going to be recorded where – in subsidies and distribution?
>
> Steve Cook:
>
> It will be reflected in SAC.

74.    In response to XM's reported Third Quarter 2005 results and earnings conference call, analysts pointed to XM's steady SAC and CPGA numbers as a positive trend for the Company. Although they anticipated holiday marketing expenses to slightly impact XM's Fourth Quarter 2005 SAC and CPGA numbers, analysts expected only a slight uptick:

(a)     Analysts from Lehman Brothers stated on October 27, 2005 that:

XMSR 3Q05 results were generally better than expected, with higher-than-forecast ARPU and *lower-than-expected CPGA, due largely to discipline in advertising and marketing spending.*

\*       \*       \*

*CPGA and SAC Better Than Expected.* SAC was $53, down 7.0% YoY and 3.6% below our $55 estimate. The below-forecast CPGA was driven by a combination of inline subsidies and distribution expense and notably lower-than-expected advertising and marketing expense (13% below forecast), combined with gross adds that were 3.5% above our expectations.

(b)     Just one day later, analysts from Lehman Brothers reported on their

estimates for XM's SAC and CPGA for the Fourth Quarter of 2005:

SAC Unchanged, CPGA Up to $107 On Higher Ad Spending. We are maintaining our $55 SAC estimate for 4Q05E, and raising our CPGA forecast to $107 from $103 due to our increased advertising and marketing spend forecast.

(c)     Deutsche Bank analysts reported on October 28, 2005 that:

*CPGA and SAC again better than expected*

*XM reported cost per gross activation (CPGA) of $89, nicely below our $103 estimate, and even with the $89 reported in 3Q04. The subscriber acquisition cost (SAC) component was $53, below our $62 estimate.* Fixed operating expense did rise in the quarter to $78m from $68m in 2Q, reflecting primarily the incremental impact of new programming initiatives.

In anticipation of more extensive marketing efforts than we previously expected, we are raising our 4Q SAC estimate to $75 per gross add from $73. Reflecting this as well as raising our advertising and marketing expense estimate from $56m from $50m, our 4Q CPGA estimate has increased to $126 from $109. Our full year estimates for SAC go to $62 from $58 and for CPGA to $108 from $103.

(d)     Concerning XM's upcoming marketing plans for the Fourth Quarter of

2005, analysts from Bear Stearns reported on October 28, 2005 that:

Higher marketing expense in 4Q does not imply the economic model has broken down. XM reported significantly lower than expected marketing expense during 3Q, effectively shirting the marketing dollars to 4Q05. Taking advantage of the upcoming holiday selling season and its reduced equipment costs, XM plans to focus on reducing the upfront cost of entry for potential subscribers even as its advertising campaigns focus on building awareness of its programming lineup. While some could argue that XM will be hard pressed to maintain market share in face of significant marketing of Howard Stern from Sirius which could impact economics, we would like to point out two things. One, Howard Stern has proven to be a phenomenon in terrestrial radio and the fans that he will bring to the Sirius platform would go to Sirius regardless of any amount of marketing that XM does. In essence, we think Howard Stern will be expanding the market for satellite radio rather than merely moving market share to Sirius. *Second, the total marketing outlay, based on XM's guidance, likely remains the same for the year, so XM is not destroying economics.* In any case, the current $50 mail-in-rebate reduces that price point to negligible levels for the older generation XM products that it is looking to close out in any case before it launches the 4G based radios in 2006.

75.    In a press release dated November 1, 2005, one-third of the way through the fourth quarter, XM issued a press release highlighting the fact that it had increased its retail market share to 59% in the third quarter, from 56% in the second quarter. In the press release, Defendant Panero stated, "XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor."

76.    On November 7, 2005, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending September 30, 2005, which was signed by Defendant Panero. The financial results reported in the 10-Q were substantially similar to those reported in the Company's October 27, 2005 press release. The November 7, 2005 10-Q included the following statements:

- [XM continued] to grow [its] subscription margin (calculated as Subscription revenue less variable costs, which include Revenue share & royalties and Customer care & billing operations) during the three months and nine months ended September 30, 2005, *while reducing our Subscriber acquisition costs*

The key metrics we use to monitor our business growth and our operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Cost Per Gross Addition ("CPGA") and EBITDA, presented as follows:

* * *

Subscriber Acquisition Costs (SAC). We consider SAC to include radio manufacturer subsidies, certain sales, activation and installation commissions, and hardware-related promotions. These costs are reported in subsidies & distribution. The negative margins from equipment sales are also included in SAC. SAC does not include on-going loyalty payments to retailers and distribution partners, payments under revenue sharing arrangements with radio manufacturers and distributors and certain guaranteed payments to GM. During the three months ended September 30, 2005 and 2004 we incurred SAC expenses of $53.4 million and $34.8 million, respectively. SAC for the three months ended September 30, 2005 and 2004 was $53 and $57, respectively. The decline in SAC for the three month period ended September 30, 2005 as compared to the three month period ended 2004 is due to the combined impacts of the decline in manufacturer subsidies and the increase in the number of activations. The timing of promotions and new contracts may cause SAC to fluctuate from period to period.

* * *

Cost Per Gross Addition (CPGA). We consider CPGA to include the amounts in SAC, as well as Advertising & marketing which includes advertising, media and other discretionary marketing expenses. In our unaudited condensed consolidated financial statements, SAC costs are captured in Subsidies & distribution and the negative margins from equipment sales, while CPGA costs are primarily captured by the combination of Subsidies & distribution, Advertising & marketing, plus the negative margins from equipment sales. CPGA does not include marketing staff (included in Retention & support) or the amortization of the GM guaranteed payments (included in Amortization of GM liability). During the three month periods ended September 30, 2005, and 2004, we incurred CPGA expenses of $87.9 million and $54.8 million, respectively. CPGA for the three month periods ended September 30, 2005 and 2004 was $89. The timing of our media campaigns and discretionary advertising spending may cause CPGA to fluctuate from period to period. The costs to acquire subscribers vary by distribution channel, and a change in the mix of subscribers from higher cost distribution channels to lower cost distribution channels will have a favorable impact on CPGA. The timing

of promotions and new contracts may cause CPGA to fluctuate from period to period.

* * *

Our funding requirements are based on our current business plan, which in turn is based on our operating experience to date and our available resources. *We are pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs.* Our plan contemplates our focusing on the new automobile market where we have relationships with automobile manufacturers, the continuing introduction of lower-priced and more user-friendly radio technology in the retail aftermarket and the use of our most productive distribution channels.

77.      The statements referenced in ¶¶70 through 73 and ¶¶75 through 76 were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to Defendants based upon their access to and review of internal XM data, were:

- Because of Defendants' numerous statements highlighting XM's ability to pursue a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs, the market expected XM's most crucial performance metrics, SAC and CPGA, to decline, including in the second half of 2005 and as compared to 2004;

- XM misrepresented and omitted crucial facts regarding its ability to reduce the costs of adding crucial new subscribers as it attempted to reach its goal of 6 million subscribers by year-end 2005;

- As was known, or disregarded with severe recklessness, by Defendants, XM would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005 in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to Defendants since before the beginning of the Relevant Period, including the impending arrival of Howard Stern at Sirius;

- Defendants knew or were severely reckless in ignoring that XM was deeply discounting radios and offering steep subsidies in order to combat supply shortages and inflate subscription numbers during the Relevant

Period, which contributed to the sharp increase in SAC and CPGA in the fourth quarter of 2005;

- Defendants knew or were severely reckless in ignoring that XM was planning to spend extraordinary sums of money as part of its Listen Large campaign in the fourth quarter of 2005, which would cause XM's SAC and CPGA to increase dramatically and in stark contrast to the decline in SAC and CPGA that XM had reported in previous quarters;

- Defendants' statements that any increase in SAC and CPGA in the fourth quarter of 2005 would be "[s]imilar to past trends" of the holiday season gave the market a false indication of the true impact that the Listen Large campaign and competitive market forces would have on XM's financial performance in the fourth quarter; and

- Despite Defendants' knowledge that XM would be making huge expenditures in the fourth quarter of 2005, Defendants failed to disclose to the market that XM's cost of subscriber acquisition would rise to extraordinary levels, leading to huge increases in XM's net losses, which was in complete reversal of the trends of declining SAC and CPGA Defendants reported and touted throughout the Relevant Period.

## D.    THE TRUTH IS REVEALED

78.    On February 16, 2006, XM issued a press release announcing its financial results for the fourth quarter of 2005 and the fiscal year ended December 31, 2005, entitled "XM Satellite Radio Holdings Inc. Announces Fourth Quarter and Full Year 2005 Results; XM to Exceed Nine Million Subscribers and Reach Cash Flow Break-Even by Year-End 2006," which stated in relevant part:

> **XM Adds Over 2.7 Million Net Subscribers in 2005; 2005 Subscription Revenue More than Doubles to $503 Million**
>
> Washington D.C., February 16, 2006 – XM Satellite Radio Holdings Inc. (Nasdaq: XMSR) today reported financial and operating results for the fourth quarter and full year ended December 31, 2005. XM reported sharply higher 2005 revenue, and the Company said it expected to report positive cash flow from operations in the fourth quarter of 2006.
>
> "2005 was a significant growth year for XM in which we added more than 2.7 million net subscribers," said Hugh Panero, President and CEO of XM Satellite Radio. "With more than six million subscribers today, XM

expects to exceed nine million subscribers by year-end and we're on track to have more than 20 million subscribers by 2010. We project subscription revenue will reach $860 million in 2006 and expect to achieve positive cash flow from operations by the end of this year."

Panero continued, "Last week, we reinforced XM's position as the premium content leader across all of radio with our announcement of the "Oprah & Friends" channel that will complement our music, talk and sports programming starting in September."

XM ended 2005 with 5,932,957 subscribers, an increase of 84 percent over 2004. Despite an intensely competitive marketplace in the fourth quarter, XM achieved net subscriber additions of 898,315. Later than expected activations from strong holiday sales brought the total to more than six million during the first week of January.

"XM achieved significant growth, added quality content and signed up important new automotive distribution partners in 2005," Panero said. "At the start of 2005, XM had 3.2 million subscribers and led the satellite radio competition by 2.1 million subscribers. Over the course of the year, XM increased that lead to 2.6 million subscribers."

**Fourth Quarter and Full-Year Financial Results**

For the fourth quarter of 2005, XM reported quarterly total revenue of $177 million, an increase of 113 percent over the $83.1 million total revenue reported in fourth quarter of 2004. XM's full year 2005 total revenue was $558.3 million, an increase of 128 percent over the $244.4 million total revenue recorded in 2004. These quarterly and annual increases in revenue were driven by our significant subscriber growth and increases in average revenue per subscriber in connection with our price increase implemented in the second quarter of 2005.

*For the fourth quarter, subscriber acquisition cost (SAC), a component of cost per gross addition (CPGA) was $89 compared to $64 in the same period last year. CPGA in the fourth quarter was $141 compared to $104 in the same period last year. These increases were primarily due to higher marketing expenses to meet a one-time competitive event in the fourth quarter. For full year 2005, SAC was $64, a slight increase from $62 in 2004, and CPGA was $109, compared to $100 in 2004. In the first quarter of 2006, XM expects a more normalized market environment and projects that SAC and CPGA will decrease in 2006.*

XM reported an EBITDA loss of ($199.4) million for the fourth quarter of 2005, including $25.3 million in de-leveraging charges, compared to an EBITDA loss of ($139.7) million for the fourth quarter of 2004, which

included $41.6 million in de-leveraging charges. The full year EBITDA loss was ($434.3) million, including $27.6 million in de-leveraging charges, compared to a 2004 EBITDA loss of ($388.4) million which included $76.6 million of de-leveraging charges. The increased EBITDA loss primarily resulted from our increase in subscribers as well as the higher fourth quarter marketing expenses.

79.     XM's February 16, 2006 earnings press release shocked the market, which had been expecting the Company to continue its touted ability to reduce and control SAC and CPGA costs while achieving "smart subscriber growth." Indeed, XM's SAC increased a startling 39% and CPGA soared 36% over and above fourth quarter 2004 levels.

80.     Compared to the third quarter of 2005, SAC sequentially increased from $53 to $89, a whopping 68% in just three months. Similarly, compared to the third quarter of 2005, CPGA climbed from $89 to $141, a 58% jump.

81.     In truth, as XM attempted to grow subscriber numbers at an aggressive pace, its SAC and CPGA skyrocketed to levels far greater than that reported to the market each quarter over the last two fiscal years:



82.     On February 16, 2006, Defendants made another startling disclosure when XM filed a Form 8-K disclosing that Director Pierce J. Roberts, Jr. ("Roberts") had submitted a letter of resignation. In his February 13, 2006 resignation letter, Director Roberts stated that:

> That said, *I have been troubled about the current direction of the company and do not believe that it is in the best interest of the company's shareholders. For some time I have made my analyses and observations known in an increasingly vociferous manner to the Board and a number of senior managers of the Company.* I am not having any useful effect and *I care too much and believe in my own views too much to just "go along."*
>
> *Given current course and speed there is, in my view, a significant chance of a crisis on the horizon. Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes.*

83.     In explaining the resignation, Defendants elaborated on the views Mr. Roberts had long made known to Defendants, stating in the Company's February 16, 2006 Form 8-K that:

Although the letter does not explicitly state the nature of the disagreement, the Company believes the disagreement with Director Roberts primarily involves the strategic balance of growth versus cash flow. *Director Roberts has historically favored more stringent cost control in the Company, specifically involving lower marketing, programming and promotional expenditures.*

The Company and other Directors concur in Mr. Roberts' assessment that lower programming and marketing expenditures, and a potentially lower growth rate, would likely result in earlier positive cash generation. The other directors, however, believe that the Company's high growth rate, market leadership and large base of subscribers are strategically important assets to ensure the company's long term value and can be sustained while also reaching positive operating cash flow later this year. These differing views of strategic direction and balance between growth and profitability have been voiced openly for a number of years, but Director Roberts states that he can no longer be effective given the ongoing disagreement with management and the other Board members regarding the relative importance, risks and priorities of these two common goals.

84.    Thus, among other things, the market learned on February 16, 2006 that one of XM's most senior and knowledgeable directors, Roberts, who had been Bear Stearns' lead telecommunications banker and who had served on all major committees of XM's Board, including the Nominating Committee, Compensation Committee, Audit Committee, as well as the informal Finance Committee, had become increasingly strident within the Company, at both the Board and senior managerial levels, about the fact that the current direction was not in the best interests of XM. Roberts was emphatic that XM needed to reign in its skyrocketing spending habits related to marketing, programming, and promotional expenditures.

85.    According to the former District Manager, XM's expensive and not entirely effective marketing campaigns, as described above, were major factors that led to Roberts' resignation. In fact, this former District Manager understood that Roberts' resignation should have come as no surprise to Panero or anyone else because, prior to his resignation, it was clear that Roberts was not happy with the Company's direction, especially its marketing and

advertising expenditures. The witness understood that Roberts did not "see eye to eye" with Panero and other members of the Board, who believed that XM had to do a "certain amount" of advertising to "have results." The witness said that XM was committed to spending money on advertising, but that Roberts was concerned about how much XM was spending. The witness added that XM was "not cash flow positive yet" and Roberts was "a bit disgruntled" about XM spending so much money on advertising when the Company was not "cash flow positive."

86.    This view of Roberts' opposition to XM's strategic plans was echoed by the comments of Defendant Parsons, XM's Chairman, at the February 16, 2006 conference call with analysts:

> On the Board issue, this is Gary Parsons. Bob, let me hit that one since it is a Board related issue, and go into a little bit of depth on it. This morning we did issue an 8-K noting that Jack Roberts who served four or five years on the Board was stepping down. And Jack's explanation of that departure involved his concerns that frankly XM was spending too heavily in order to achieve the rapid growth that we were experiencing, and his belief that slowing down that spending would result in a more immediate positive cash flow pop. *And Jack has expressed his concerns for some period of time. While other Board members supported stronger programming content, marketing efforts and accelerated growth.*

> \*       \*       \*

> Frankly, based on the numbers from the fourth quarter, we did grow strongly, but we failed to do so economically as we had expected or planned to. In prior quarters and in prior years we have grown strongly, and we have grown cost effectively or economically. And we feel quite frankly when we look at the '06 plan that we will continue to grow strongly and economically, and we will can return to the pattern of solid economic return and growth with a moderating SAC and CPGA, declining EBITDA losses, positive operating cash flow later in the year, and very – we feel very positive about the upcoming '06 outlook.

87.    Now that a substantial part of the truth behind XM's finances was exposed that had previously been concealed and misrepresented by Defendants, between the close of trading on February 15, 2006 and the close of trading on February 17, 2006, the Company's stock price

traded at an extraordinarily unusual and high volume as it collapsed nearly 13%, falling to a close of $21.57 on February 17, 2006, down approximately 40% from a Relevant Period peak of more than $36.00 per share.

88.    As indicated above, as XM's true financial condition was revealed to the market, a picture of the extent of Defendants' misconduct emerged. Thus, when XM's stock price dropped upon revelation of XM's true financial condition concealed by the fraud, investors suffered losses.

89.    As a result of the Individual Defendants' misconduct, numerous securities class action lawsuits have been filed against the Company. The Individual Defendants' misconduct has caused or will cause the Company to incur millions of dollars of legal fees and expenses in defending against these lawsuits and has exposed the Company to millions of dollars of liability for securities fraud.

90.    In the months that followed the Company's revelation of the truth, the Company disclosed additional disturbing news about its operations. On April 27, 2006, XM announced that the Federal Trade Commission had launched an investigation into several of the Company's aggressive marketing practices, including XM's rebate programs. In addition, on September 5, 2006, XM disclosed that "the Securities and Exchange Commission is looking into the company's handling of its estimates of subscriber counts as well as the cost of recruiting customers and related matters during the third and fourth quarters of 2005. These questions appear to pertain to matters similar to the issues underlying the previously disclosed securities litigation filed against us earlier this year." The SEC requested that XM produce documents regarding its subscriber targets and related matters for the third and fourth quarters of 2005.

91.     With respect to the SEC investigation, the Company made the following disclosure in its Form 10-Q for the third quarter ending September 30, 2006:

> SEC Inquiry – As previously disclosed, by letter dated August 31, 2006 and subsequent follow-up letters, the Staff of the Securities and Exchange Commission ("SEC") requested that we voluntarily provide documents to the Staff, including information relating to our subscriber targets, costs associated with attempting to reach those targets during the third and fourth quarters of 2005, the departure of Mr. Roberts from our board of directors, our historic practices regarding stock options and certain other matters. In this connection we retained outside counsel, who engaged an independent accounting advisor, to conduct a review of our stock option practices. The inquiry did not reveal the existence of material errors in any prior financial statements.

92.     The Company has incurred and will continue to incur costs as the result of this investigation.

93.     On September 6, 2006, the Wall Street Journal published an article reporting on the Company's problems:

> XM Satellite
>
> XM Satellite Radio Holdings Inc. said the Securities and Exchange Commission is informally examining its subscriber targets for the end of last year, along with costs associated with reaching those targets.
>
> The satellite-radio company said a letter from the SEC requesting documents related to the subscriber targets appeared to pertain to the same matters that underlie a shareholder lawsuit filed earlier this year. The shareholder suit alleges that XM misled investors regarding its ability to cut costs and reach its subscriber goals, and complains that the executives sold stock before disclosing the large rise in costs.
>
> XM's subscriber-acquisition costs rose in the fourth quarter to $89 per subscriber, compared with $64 the previous year, more than investors had expected.
>
> Investor carefully watch subscriber targets as a sign of the Washington, D.C. company's overall health. XM ended 2005 with 5.9 million subscribers, short of the estimate of six million subscribers it issued earlier in that year. XM reached the six million target in early January 2006.

In early December 2005, several XM executives sold large amounts of stock. XM Chief Executive Hugh Panero exercised his stock options and sold 413,334 shares on Dec. 6, 2005. He purchased the shares at prices of $9.52 and $5.34 and sold them at prices in the $28 range. Following these transactions at the end of last year, Mr. Panero beneficially owned 5.393 shares. He held vested and unvested stock options on an additional 1.9 million shares. XM's shares have fallen steeply since then, closing at $12.79, up seven cents, yesterday in 4 p.m. composite trading on the Nasdaq Stock Exchange.

E.    **INSIDER TRADING**

94.    Defendants' inflated claims about XM's ability to continue to only pursue cost-effective growth had the effect of maintaining XM's stock price long enough for insiders to dump their XM shares on an unsuspecting market.

95.    Taking full advantage of the artificial inflation of XM's common stock prices during the Relevant Period, Panero, Haywood, Patsiokas, Titlebaum and Cook made huge sales of their personal holdings during the fourth quarter of 2005, before any disclosure of the astronomical increases in XM's SAC and CPGA were revealed to the unsuspecting market. Notwithstanding their access to this and other non-public information, these Defendants disposed of very large quantities of their stock.

96.    The following chart shows Panero's trading of XM stock:

**Hugh Panero, President and CEO:**

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 12/06/2005 | 74,820 | $28.41 | $2,125,636.20 |
| 12/06/2005 | 50,000 | $28.53 | $1,426,500 |
| 12/06/2005 | 30,000 | $28.80 | $864,000 |
| 12/06/2005 | 30,000 | $28.52 | $855,462 |
| 12/06/2005 | 25,000 | $28.40 | $710,000 |
| 12/06/2005 | 23,514 | $28.55 | $671,324.70 |
| 12/06/2005 | 20,000 | $28.46 | $569,122 |
| 12/06/2005 | 20,000 | $28.38 | $567,600 |

| 12/06/2005 | 20,000 | $28.37 | $567,400 |
|---|---|---|---|
| 12/06/2005 | 10,000 | $28.95 | $289,500 |
| 12/06/2005 | 10,000 | $28.94 | $289,400 |
| 12/06/2005 | 10,000 | $28.90 | $289,000 |
| 12/06/2005 | 10,000 | $28.88 | $288,800 |
| 12/06/2005 | 10,000 | $28.78 | $287,800 |
| 12/06/2005 | 10,000 | $28.77 | $287,670 |
| 12/06/2005 | 10,000 | $28.64 | $286,400 |
| 12/06/2005 | 10,000 | $28.58 | $285,750 |
| 12/06/2005 | 10,000 | $28.52 | $285,200 |
| 12/06/2005 | 10,000 | $28.49 | $284,900 |
| 12/06/2005 | 10,000 | $28.48 | $284,700 |
| 12/06/2005 | 10,000 | $28.46 | $284,600 |
| **TOTAL** | **413,334 (99% OF THEN-OWNED XM SHARES)** | | **$11,800,764.90** |

97.    In addition to Panero, several other key XM insiders sold large quantities of XM stock at artificially inflated prices, reaping millions of dollars in illicit gains:

(a)    Defendant Haywood, one of XM's Directors, sold 2,071,000 shares of XM stock over the course of three days during the Relevant Period: November 8th, 9th, and 10th, 2005. All told, Haywood sold approximately 72% of his then-owned XM shares and reaped *approximately $59 million* in proceeds, selling his shares between $27.85 and $29.61 per share;

(b)    Defendant Patsiokas, XM's Executive Vice President, sold 103,514 shares on December 6, 2005, at prices ranging from $28.55 to $28.95, to reap proceeds of $2,976,000, thus selling approximately 62% of his then-owned XM shares;

(c)    Defendant Titlebaum, XM's Executive Vice President, General Counsel, and Secretary, sold 103,514 shares on December 6, 2005 at $28.4356, to reap proceeds of $2,943,482, thus selling approximately 66% of this then-owned XM shares; and

(d)    Defendant Cook, XM's Executive Vice President of Sales and Marketing, sold 78,514 shares on December 6, 2005, at prices ranging from $28.37 to $28.95, to reap proceeds of $2,238,000, thus selling approximately 43% of his then-owned XM shares.

98.    Both the timing of the sales and the sales prices are suspicious. Panero and other insiders sold all of the stock they actually owned between $27.85 and $29.61 during November and December 2005, shortly before XM would announce its bloated SAC and CPGA figures.

### DEMAND WOULD BE FUTILE

99.    Plaintiff brings this action derivatively in the right and for the benefit of XM to redress injuries suffered by XM as a result of the breaches of fiduciary duty by the Individual Defendants alleged herein.

100.    Plaintiff will adequately and fairly represent the interests of XM and its shareholders in enforcing and prosecuting its rights.

101.    Plaintiff is an owner of XM common stock and has been an owner of XM common stock during the time period in which the Individual Defendants' wrongful course of conduct alleged herein was occurring through the present.

102.    Plaintiff has not made a demand on the board of directors to bring the causes of action alleged herein because such a demand would be futile. At the time these derivative actions were commenced, XM's board of directors consisted of ten members: Gary Parsons and George Haywood (members of the Company's Finance Committee), Hugh Panero (the Company's President and Chief Executive Officer), Nathaniel A. Davis (member of the Company's Audit and Nominating Committees), Thomas J. Donohue (member of the Company's Compensation and Nominating Committees), Eddy W. Hartenstein, Chester A. Huber, Jr. and John Mendel (members of the Board of Directors), Jarl Mohn (member of the

Company's Compensation and Finance Committees), and Jack Shaw (member of the Company's Audit, Compensation, and Finance Committees).[4] As detailed below, each of the directors are subject to substantial liability on the derivative claims alleged herein and is therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

103.    All of the Defendant Directors face a substantial likelihood of liability in this action because they knew that the Company's public statements in press releases and SEC filings were materially false and misleading as alleged above; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents. The Defendant Directors either knew or should have known, in the absence of extreme recklessness, that violations of law were occurring and took no steps in a good faith to prevent, correct or remedy that situation.

104.    Defendant Directors Panero and Haywood engaged in an illegal insider trading during the Relevant Period. These Defendants' illegal insider stock sales occurred shortly before the Company's disclosure concerning the astronomical increases in XM's SAC and CPGA for the fourth quarter of 2005. In particular, Defendant Panero sold 99% of his then-owned XM shares for proceeds of $11,800,764.90 and Haywood sold 72% of his then-owned Company shares for proceeds of $59 million. These Defendants face a substantial likelihood of liability for these illegal stock sales and are not disinterested. As indicated by the Company in its February 16, 2006 Form 8-K and February 16, 2006 conference call with analysts, the Defendant Directors

---

[4]    Defendant Director Haywood resigned from the Board on October 3, 2006.

were aware of the skyrocketing expenses related to marketing, programming and promotional expenditures during the fourth quarter 2005. Indeed, as stated by former Director Roberts in his resignation letter to the Company in February 2006, "[f]or some time I [Roberts] have made my analyses and observations [concerning his belief that XM was spending too heavily on marketing, programming and promotional matters] known in an increasingly vociferous manner to the Board and a number of senior managers of the Company." The Defendant Directors knew, or in the absence of severe recklessness, should have known that the huge increases in expenses incurred by the Company for these matters during the fourth quarter 2005 would have a significant negative impact on the Company's SEC and CPGA. Indeed, as disclosed by the former SVP of Human Resources, the major marketing and subscriber growth initiatives undertaken during the fourth quarter of 2005 have been fully budgeted well in advance because it was known as early as October 2004 that Howard Stern would begin broadcasting on SIRIUS in January 2006. As the SVP of Human Resources said, these costs could simply not be viewed as any kind of a surprise of unanticipated event. Thus, although the Defendant Directors were aware that the Company's SAC and CPGA could be expected to substantially increase during fourth quarter 2005, they nevertheless permitted the Company to make false and misleading statements that led the public and market to believe that these costs would remain low.

105.    Director Defendants Davis, Hartenstein, and Shaw also had enhanced responsibilities as members of the Company's Board of Directors' Audit Committee. According to the Company's Board of Directors' Audit Committee Charter, the Audit Committee has the responsibility to review earnings releases before they are released to the public. Accordingly, Defendants Davis, Hartenstein and Shaw as members of the Audit Committee were charged with the responsibility of reviewing the earnings releases in which materially false and misleading

representations were made, including the press releases issued by the Company on July 28, 2005 and October 27, 2005. Although, as these Defendants knew, these press releases contained false and misleading information Defendants Davis, Hartenstein and Shaw, nevertheless, approved or permitted their release to the investing public.

106.    Defendant Director Panero as the Company's current President and Chief Executive Officer, lacks the independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

107.    Moreover, Plaintiff has not made a demand on XM's Board of Directors to bring these causes of action because such a demand would be futile and useless for the following additional reasons:

    a.    Defendant Parsons and Panero are not considered independent directors of XM because of their employee status with XM. Because of this, it is reasonable to conclude that they would not authorize suit against each other or the other Defendant Directors. Therefore, demand upon Defendant Directors Parsons and Panero would be futile.

    b.    Defendant Huber is not considered an independent director of XM. Defendant Huber is a current employee of General Motors. XM has a long-term distribution agreement with OnStar, a subsidiary of General Motors. Defendant Huber would not take any action to jeopardize this business relationship. Therefore, demand upon Defendant Huber would be futile.

    c.    Defendant Mendel is not considered an independent director of XM. Mendel is an employee of American Honda Motor Co., Inc. ("Honda"). Honda owns approximately 11.4% of the Company's Class A Shares and holds approximately 63% of the Company's outstanding Series C convertible preferred stock. Additionally, XM has a current distribution agreement with Honda. Therefore, demand upon Defendant Mendel would be futile.

    d.    Indeed, in an April 21, 2003 new article, the New York Times commented upon Honda and GM's close relationship with XM:

        Last week, XM, based in Washington, announced that it

had passed the 500,000-subscriber mark. General Motors and the American Honda Motor Company are now its biggest shareholders and are strongly committed to offering satellite radio as an option in new cars.

* * *

But Mr. Panero's most important strategic decision was to align XM with General Motors. In return for an agreement that made G.M. the only car company able to install XM receivers in new cars until this year, XM got both an investor and an enthusiastic partner.    Sirius signed agreements with numerous other auto companies, including Ford and DaimlerChrysler, but they were nonexclusive and did not involve major investments in Sirius or aggressive rollout programs.

Executives at G.M. say they threw their resources behind XM rather than Sirius largely because XM had agreed to buy satellites and related ground technology from G.M.'s Hughes aerospace and electronics subsidiaries and to work with Hughes' DirecTV satellite television unit.

e.    Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

f.    The Director Defendants of XM, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise same. Each of the Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

g.    In order to bring this suit, a majority of the Directors of XM would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

h.    The acts complained of constitute violations of the fiduciary duties owed by XM's officers and directors and these acts are incapable of ratification.

i.     XM has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct or attempted to recover for XM any part of the damages XM suffered and will suffer thereby or to recover any of the illegal insider sales proceeds.

j.     The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept demand.

k.     Any suit by the directors of XM to remedy these wrongs would likely expose the Director Defendants and XM to further violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants; thus they are hopelessly conflicted in making any supposedly independent and disinterested determination whether to sue themselves. In this regard, Defendant Panero has been named as a defendant in the related securities class action lawsuit.

108.   Plaintiff has not made any demand on the shareholders of XM to institute this action since demand would be a futile and useless act for the following reasons:

a.     XM is a publicly held company with approximately 259 million shares outstanding, and thousands of shareholders;

b      Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.     Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

109.   Making demand on all shareholders would also force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

110.   XM has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

a.     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

b.     Costs related to the current SEC investigation of the Company.

## FIRST CAUSE OF ACTION

### Against Individual Defendants for Breach of Fiduciary Duty

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

112.    The Individual Defendants owed and owe XM fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe XM the highest obligation of good faith, fair dealing, loyalty and due care.

113.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

114.    The Individual Defendants had actual or constructive knowledge that they had caused or permitted the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct same. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, XM has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

116.    Plaintiff, on behalf of XM, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Abuse of Control

117.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

118.   The Individuals Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence XM, for which they are legally responsible.

119.   As a direct and proximate result of the Individual Defendants' abuse of control, XM has sustained significant damages.

120.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

121.   Plaintiff, on behalf of XM, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Gross Mismanagement

122.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

123.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of XM in a manner consistent with the operations of a publicly held corporation.

124.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, XM has sustained significant damages in excess of millions of dollars.

125.   Plaintiff, on behalf on XM, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### Against the Individual Defendants for Waste of Corporate Assets

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

127.    As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused XM to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

128.    As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

129.    Plaintiff, on behalf of XM, has no adequate remedy at law.

### FIFTH CAUSE OF ACTION

### Against the Individual Defendants for Unjust Enrichment

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

131.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of XM.

132.    Plaintiff, as shareholder and representative of XM, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

### SIXTH CAUSE OF ACTION

**Against the Individual Defendants Panero, Haywood, Cook, Titlebaum and Patsiokas for Insider Selling**

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

134.    At the time of the Individual Defendants' stock sales set forth herein, such Individual Defendants knew the information described above and sold XM common stock on the basis of such information.

135.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.    It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold XM common stock.

136.    The Individual Defendants' sale of XM common stock, while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

137.    Since they used the Company's proprietary information for their own gain, this constitutes a breach of the Insider Selling Defendants' fiduciary duties, and the Company is entitled to the imposition of a constructive trust on any profits Defendants obtained thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.    Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive   relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual and Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.    Awarding to XM  restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

s/William B. Federman
William B. Federman
Attorneys for Plaintiff
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Fax: (405) 239-2112
wfederman@aol.com

-and-

Kimberly A. Chadwick
DOHERTY, SHERIDAN & PERSIAN LLP
8408 Arlington Blvd., Suite 200
Fairfax, VA 22031
Telephone: (703) 698-7700
Fax: (703) 641-9645
kchadwick@dsp-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2006, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants who are currently on the list to receive email notices for this case:

Charles Edward Davidow
Charles.davidow@wilmerhale.com

Michael A. Mugmon
Michael.mugmon@wilmerhale.com

Christopher J. Herrling
cherrling@wilmer.com

_s/William B. Federman_____
William B. Federman